UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Lyle Brennan, Christopher Richard,
and Michael Lundell, on behalf of
themselves and other individuals
similarly situated,

              Plaintiffs,

   v.

Qwest Communications International,
Inc., Qwest Communications Corporation,
and Qwest Corporation,

             Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 07-2024 ADM/JSM

_____

James H. Kaster, Esq., Paul J. Lukas, Esq., Sarah M. Fleegel, Esq., David E. Schlesinger, Esq., and Amy S. York, Esq., Nichols Kaster & Anderson, PLLP, Minneapolis, MN; and Paul Egtvedt, Esq., Egtvedt Law Firm, PLC, Minneapolis, MN, on behalf of Plaintiffs.

Robert R. Reinhart, Esq., Melissa Raphan, Esq., and Ryan E. Mick, Esq., Dorsey & Whitney LLP, Minneapolis, MN, on behalf of Defendants.
_____

## I. INTRODUCTION

On March 10, 2009, the undersigned United States District Judge heard oral argument on the Motion for Decertification [Docket No. 279] of Defendants Qwest Communications International, Inc., Qwest Communications Corporation, and Qwest Corporation (collectively "Qwest"). Plaintiffs Lyle Brennan, Christopher Richard, and Michael Lundell ("Plaintiffs") also seek review of their Objections [Docket No. 309] to Magistrate Judge Janie S. Mayeron's January 26, 2009 Report and Recommendation ("R&R") [Docket No. 304] that the claims of 91 consent plaintiffs be dismissed with prejudice. For the reasons set forth herein, Qwest's Motion for Decertification is denied, Plaintiffs' Objections are overruled, and the R&R is adopted.

## II. BACKGROUND

On March 25, 2008, this Court issued an Order [Docket No. 108] granting Plaintiffs' Motion for Conditional Class Certification [Docket No. 37] of their action asserting claims against Qwest for wage violations under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219, and the Minnesota Fair Labor Standards Act ("MFLSA"), Minn Stat. §§ 177.21-.35. Because the issues raised by the current Motion for Decertification are substantially similar to those discussed in the March 25, 2008 Order, the factual and procedural background described in the March 25, 2008 Order is repeated here, along with additional information that has been revealed through discovery.

Qwest is a telecommunications company that operates an electronic communications network of internet service, cellular telephone service, long-distance telephone service, and digital television service provided to business and residential customers. March 25, 2008 Order at 2. Plaintiffs are current and former Qwest network technicians employed at facilities throughout Minnesota. Id.; Collective and Class Action Compl. [Docket No. 1] ¶ 3. As network technicians, Plaintiffs typically spend their work days installing, maintaining, repairing, and testing various aspects of Qwest's electronic communications network. Fleegel Aff. ¶ 3, Jan. 23, 2009 [Docket No. 302] Ex. 1. Network technicians begin their work day at a Qwest garage and drive Qwest trucks to the customer's premises to perform their work. March 25, 2008 Order at 2. Qwest sets forth the following requirements for job performance: (1) the technician must "review all assigned work and commitment times before leaving the garage"; (2) the technician must start work at the assigned start time with his or her truck "ready to go, clean, and stocked with materials for [the day's] work"; (3) the technician must "call [the] first customer and

dispatch on [the] first work item within 30 minutes of [the] start time and prior to leaving [the] garage"; (4) all "testable fault activity" must be pre-tested by the technician before dispatch; and (5) the technician must complete time entry at the end of the work day. Id. at 2-3; Buchholz Aff., Jan. 7, 2008 [Docket No. 59] Ex. A. Technicians are expected to leave the garage for the first job within fifteen minutes of the start time. Id. at 3; see generally Mick Aff. ¶ 7, Dec. 19, 2008 [Docket No. 282], Ex. 6 (Brennan Dep.) 107:6-109:25, 155:4-22. Qwest does not independently keep track of hours worked by the network technicians and instead relies on the technicians to self-report their hours worked using a handheld device. E.g., Weller Aff. ¶¶ 5, 15, Jan. 4, 2008 [Docket No. 289].

Qwest requires that its network technicians meet productivity or performance standards, which are set forth in the Quality Jobs per Day ("QJD") program. Fleegel Aff. ¶ 3, Jan. 23, 2009, Ex. 45 (Scribner Dep.) 27:24-28:22. Prior to implementation of the QJD program, technicians were subjected to a similar performance standard known as the Effective Jobs per Day ("EJD") program.[1] Id. 28:6-12. The QJD program utilizes a formula to compute a QJD score, which represents the number of "productive jobs" a technician completes within the total hours worked on a particular day. Fleegel Aff. ¶ 3, Jan. 23, 2009, Ex. 4 at 5. The QJD score is calculated by first determining the total number of "productive jobs," meaning all completed jobs minus those that require "any type of rework following a completed dispatch within a 30 day window." Id., Ex. 4 at 5, Ex. 5 at 4. The QJD score is calculated by dividing the total number of productive jobs by the "total hours worked," which consists of all payroll hours

---

[1] Apparently, the alleged off-the-clock work performed while EJD was in existence, prior to implementation of QJD, is similarly evaluated. For convenience, the Court will refer to QJD throughout this order.

3

(regular and overtime) but excludes any "entitlement time, paid union activities, or any excused time paid (jury duty, death in the family, etc.)." Id., Ex. 4 at 5, Ex. 5 at 5. Qwest correlates the QJD scores to the following classifications: more than satisfactory, satisfactory, less than satisfactory, and needs improvement. Id. Ex. 6. For example, a QJD score of 5.16 or better for a technician working on "plain old telephone service" ("POTS") is deemed "more than satisfactory," while a score of 4.3 or less is classified as "needs improvement." Id. Technicians whose QJD score classifies them as "needs improvement" are subject to progressive discipline. Id. "Technicians will progress from Documented Discussion, to Written Warning, then Warning of Dismissal, and finally become subject to Dismissal." Id.

Plaintiffs assert that Qwest's QJD expectations force them and other similarly situated employees to work without pay before and after their shifts, as well as during meal and rest breaks, in violation of the FLSA and MFLSA. In addition, they claim that other company-wide policies regarding start times and the taking of breaks further contribute to the alleged wage violations.

### III. DISCUSSION

**A.     Motion for Decertification**

Under 29 U.S.C. § 216(b), any one or more employees may bring a collective action to collect unpaid overtime compensation against an employer "for and in behalf of himself or themselves and other employees similarly situated." For a case to proceed as a collective action under § 216(b), the plaintiffs bear the burden of establishing that they are "similarly situated." See Smith v. Heartland Auto. Servs., Inc., 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005). This burden is "not so rigorous that [the plaintiffs] must demonstrate their positions are identical," but

4

merely that their positions are "similar." Nerland v. Caribou Coffee Co., Inc., 564 F. Supp. 2d 1010, 1018 (D. Minn. 2007) (quotation omitted). Because the FLSA does not define the term "similarly situated" and the Eighth Circuit has yet to offer its construction of the term, courts in this circuit, including the District of Minnesota, have typically approached the issue of whether plaintiffs are similarly situated through a two-stage process. See March 25, 2008 Order at 5-6; Greenwald v. Phillips Home Furnishings Inc., No. 4:08CV1128, 2009 WL 259744, at *4 (E.D. Mo. Feb. 3, 2009) (collecting cases). The Court's March 25, 2008 Order granting Plaintiffs' motion for conditional class certification represented the first stage of that process. Discovery has since been completed, and Qwest's current Motion for Decertification triggers the second stage of the process.

In the second stage, a court must make a factual determination on whether the plaintiffs are similarly situated. Nerland, 564 F. Supp. 2d at 1017. If the claimants are found to be similarly situated, the court allows the case to proceed to trial as a collective action; but if not, the court decertifies the class, the opt-in plaintiffs are dismissed without prejudice, and the class representatives (the original named plaintiffs) proceed to trial on their individual FLSA claims. See id. at 1017-18. In deciding whether the plaintiffs are similarly situated, a court considers several factors, including (1) the extent and consequences of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) other fairness and procedural considerations. Id. at 1018; Smith, 404 F. Supp. 2d at 1150 (quoting Thiessen v. General Elec. Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001)).

1. **Disparate Factual and Employment Settings**

Plaintiffs argue that the factual and employment settings of the named plaintiffs and those of the opt-in plaintiffs are substantially similar. They assert that all of the named plaintiffs and opt-in plaintiffs have the same job title of "network technician," they all have the same job description, they all perform many of the same job duties, they all work in Minnesota, and they all are hourly employees. Pls.' Mem. in Opp'n to Mot. for Decert. [Docket No. 301] at 8-9 (citing Fleegel Aff., Jan. 23, 2009, Ex. 1). Qwest does not unequivocally deny that the named plaintiffs and the opt-in plaintiffs have substantially the same responsibilities and perform substantially the same tasks, although Qwest cites testimony by one network technician that "[w]e all have the same . . . job title, but we have different job functions." Fleegel Aff. ¶ 3, Jan. 23, 2009, Ex. 36 (Lundell Dep.) 290:22-24. Qwest also notes that one technician testified that network technicians have "different work routines," agreeing that some come in later than others, some leave the garage earlier than others, some return to the garage at the end of the day sooner than others, and some stock their trucks and complete paperwork at the end of their shifts rather than the beginning. Id., Ex. 27 (Kanada Dep.) 17:25-19:12. The Court finds that these discrepancies in the particular manner of how network technicians perform substantially similar tasks during the day are inconsequential for purposes of the question of decertification. Faced with a similar argument, the court in Frank v. Gold'n Plump Poultry, Inc. responded:

> [Defendant] exaggerates the factual differences among employees on various shifts and in different departments. If one zooms in close enough on anything, differences will abound; even for a single employee doing a single job, the amount of time that she spends [on preparatory work at or before the start of her shift] on Monday will

6

> differ, at least minutely, from the amount of time that she spends [on such preparatory work] on Tuesday.

No. 04-CV-1018, 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007).

Given the parties' arguments, the more important issue in evaluating disparities in the factual and employment settings is whether or not the named plaintiffs and opt-in plaintiffs are all subject to the same basic requirements and policies implemented by Qwest, in particular, the QJD program. Plaintiffs' assert that they are all subject to the same requirements and that they are similarly situated because they necessarily had to work before the start of their shifts, during their breaks, and after the end of their shifts in order to meet QJD standards and comply with other policies (for example, the policy that technicians had to leave the garage for their first job no later than fifteen minutes after the start of their shifts). In response, Qwest cites minor differences in how the requirements and policies apply depending on the job that a technician was performing on a given day or how long a particular individual had been working as a technician. Again, such minor discrepancies are inconsequential for purposes of the issue presented by the decertification motion.

Qwest's primary argument regarding QJD and other company policies is that the fact that technicians are all subject to the same requirements and policies is insufficient by itself to show that Qwest required or permitted technicians to work off-the-clock. Qwest finds it significant that 61 technicians testified that they were unaware whether their supervisors knew they had been working off-the-clock while only 34 technicians testified that their supervisors were aware of off-the-clock work. See Mick Aff. ¶¶ 29-30 , Dec. 19, 2008, Exs. 28, 29. In addition, Qwest maintains, productivity requirements such as QJD are legal and the Court would be "fashion[ing] a new rule of law" if it were to allow Plaintiffs' collective action to proceed on the theory that

Qwest's QJD productivity standards were forcing technicians to work off-the-clock absent "substantial proof of an actual corporate policy or plan to deny overtime pay." Defs.' Reply Mem. in Supp. of Mot. for Decert. [Docket No. 314] at 10 n.11. Qwest also contends that Plaintiffs have offered no evidence, such as some "benchmark of 'reasonable' productivity expectations," to support the assertion that the QJD standards are too burdensome and inevitably compel technicians to work off-the-clock. Finally, Qwest argues that many (and perhaps most) technicians regularly satisfy their minimal QJD expectations. Id. at 3-10.

Plaintiffs' assertion that Qwest's policies had the effect of requiring technicians to work before and after their shifts and through their breaks is not dependent on proof that supervisors had actual knowledge that the policies had such an effect. An employer can be held liable under the FLSA for unauthorized, unpaid overtime when the employer had actual *or constructive* notice that employees were working off-the-clock. Wang v. Chinese Daily News, Inc., 435 F. Supp. 2d 1042, 1060 (C.D. Cal. 2006) (citing cases); see also Newton v. City of Henderson, 47 F.3d 746, 748 (5th Cir. 1995) (recognizing that an employer can be liable for unpaid overtime if the employer had knowledge, actual or constructive, that the employee was working off-the-clock); Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986) (holding that a district court correctly required a plaintiff to prove that an employer had either actual or constructive knowledge of overtime work as an element of an FLSA claim for unpaid overtime); Warren v. Edgeco, Inc., 392 N.E.2d 857, 859-60 (Mass. App. Ct. 1979) (finding that liability for unpaid overtime can be found if "there is evidence upon which [a] jury could find the employer was aware that the employee was working unreported time."). If the circumstances are such that the

8

employer "knew or should have known" that employees were working off-the-clock, the employer can be held liable for unpaid overtime. Wang, 435 F. Supp. 2d at 1060.

The more fundamental problem with Qwest's arguments, however, is that they are directed to the ultimate merits of Plaintiffs' unpaid overtime claims and the fact question of whether Qwest knew or should have known that technicians were working off-the-clock. The central question at issue in the decertification motion is whether the named plaintiffs and opt-in plaintiffs are similarly situated, not whether the FLSA was violated. See, e.g., Bouaphakeo v. Tyson Foods, Inc., 564 F. Supp. 2d 870, 893-94 (N.D. Iowa 2008) ("[W]hether at the first or second step in the § 216(b) collective action certification process, plaintiffs need not prove the merits of their claim."); Smith, 404 F. Supp. 2d at 1148 ("[T]he Court does not consider the merits of Plaintiffs' claims on a decertification motion . . . ."); Vaszalvik v. Storage Tech. Corp., 175 F.R.D. 672, 680 (D. Colo. 1997) ("[W]hether plaintiffs can meet their burden in the liability phase . . . is irrelevant to the question of § 216(b) certification). Furthermore, Qwest's arguments place undue emphasis on the subjective state of mind of the supervisors and technicians. "The reason an employee continues to work beyond his shift is immaterial; if the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted." Reich v. Dep't of Conservation & Natural Res., 28 F.3d 1076, 1082 (11th Cir. 1994) (citing 29 C.F.R. § 785.11).

Plaintiffs have presented evidence that the named plaintiffs and opt-in plaintiffs share similar factual and employment settings because each was subject to minimum QJD standards and other requirements. Plaintiffs submitted the declarations of named and opt-in plaintiffs, who stated that they had to work off-the-clock without compensation in order to comply with Qwest's

9

policies and meet the QJD standards. Fleegel Aff. ¶ 3, Jan. 23, 2009, Ex. 62 (Fix Decl.) ¶¶ 4-7; Ex. 63 (Brennan Decl.) ¶¶ 4-13; Ex. 64 (Lundell Decl.) ¶¶ 4-14; Ex. 65 (Guthrie Decl.) ¶¶ 4-8; Ex. 66 (Buckner Decl.) ¶¶ 4-9; Ex. 67 (Hendrickson Decl.) ¶¶ 4-10; Ex. 68 (Sullivan Decl.) ¶¶ 4-8; Ex. 69 (Richie Decl.) ¶¶ 4-10; Ex. 70 (Dietz Decl.) ¶¶ 4-8; Ex. 71 (Biederman Decl.) ¶ 4; Ex. 72 (Ablan Decl.) ¶ 4; Ex. 73 (Jacobsen Decl.) ¶ 4; Ex. 74 (Kirkendall Decl.) ¶ 4; Ex. 75 (Siepker Decl.) ¶ 4. Plaintiffs also have proffered evidence that, if believed, shows Qwest knew or should have known that technicians were working off-the-clock in order to meet QJD standards. Several of the declarants stated that their supervisors were aware that they worked off-the-clock and two declarants from different Qwest facilities specifically stated that their supervisors instructed them not to report overtime. Brennan Decl. ¶ 16; Lundell Decl. ¶¶ 9, 15-16; Buckner Decl. ¶ 10; Hendrickson Decl. ¶¶ 7, 11; Richie Decl. ¶ 7; Dietz Decl. ¶ 9. In addition, Plaintiffs deposed several Qwest supervisors who testified that technicians had complained to them that the QJD standards simply could not be met with one supervisor estimating that probably half of the technicians he supervised had made such complaints. Fleegel Aff. ¶ 3, Jan. 23, 2009, Ex. 15 (Buchholz Dep.) 49:20-24; Ex. 38 (Matthews Dep.) 73:10-74:19; Ex. 26 (Hammerschmidt Dep.) 49:8-22; Scribner Dep. 45:21; Ex. 25 (Fixell Dep.) 19:14-23:12. Plaintiffs' evidence may convince the factfinder that Qwest either knew or should have known that employees were under-reporting their work hours,[2] unlike Brumbelow v. Quality Mills, Inc., 462 F.2d 1324, 1327 (5th Cir. 1972), where the employee was estopped from asserting a claim for unpaid overtime

---

[2] Although there may be other testimony to support the assertion that the QJD standards were not unduly burdensome and that Qwest had no actual or constructive knowledge of unpaid overtime, those matters are appropriately left for a credibility determination in considering Plaintiffs' claims on the merits.

when the employee self-reported his hours worked and the record lacked any evidence to show that the employer knew or should have known that the employee was unable to perform up to the employer's productivity standards without giving false information regarding the hours worked.

## 2. Individualized Defenses

The second factor in deciding whether the named plaintiffs and opt-in plaintiffs are similarly situated requires the Court to consider whether potential defenses would make the proposed collective action unmanageable. Nerland, 564 F. Supp. 2d at 1024. Qwest argues that there are individualized defenses regarding whether the supervisors of some technicians knew that off-the-clock work was occurring. As indicated in the preceding discussion, however, the relevant question is not whether a specific supervisor knew that off-the-clock work was occurring but rather whether the circumstances were such that Qwest, as the employer, knew or should have known that off-the-clock work was occurring. Certainly, the fact that some, perhaps many, supervisors did not know about off-the-clock work will be relevant to determining that question, but that is an issue for the factfinder considering the ultimate merits of Plaintiffs' claims and not a relevant factor in determining if the named plaintiffs and opt-in plaintiffs are similarly situated. Cf. Pendlebury v. Starbucks Coffee Co., 518 F. Supp. 2d 1345, 1362 (S.D. Fla. 2007) (concluding that arguments by a defendant bearing on the credibility of witnesses and evidence were matters "for the factfinder, not individualized *defenses*.").

Qwest next contends that individualized resolution is required for issues such as the extent to which certain technicians were or were not able to meet QJD standards and whether certain technicians were ever disciplined for falling short of QJD expectations. Plaintiffs respond these issues relate to damages rather than liability and that, instead of decertifying, the

better course would be to bifurcate the trial into a liability stage and damages stage, an approach favored by other courts. See Pls.' Mem. in Opp'n to Mot. for Decert. at 25 (citing Nerland, 564 F. Supp. 2d at 1025; Thiessen, 267 F.3d at 1107; Falcon v. Starbucks Corp., 580 F. Supp. 2d 528, 541 (S.D. Tex. 2008); Wilks v. Pep Boys, No. 3:02-0837, 2006 WL 2821700, at *7 (M.D. Tenn. Sept. 26, 2006)). The Court agrees with Plaintiffs that liability will turn largely on the class-wide question of whether Qwest knew or should have known that technicians were working off-the-clock in order to comply with QJD standards and other Qwest policies. If liability is proven, the extent that some opt-in plaintiffs allegedly did not perform any off-the-clock work or attributed their off-the-clock work to reasons other than the QJD standards and other Qwest policies can be evaluated at a damages phase. Whether this makes the trial unmanageable depends on the number of plaintiffs involved and other factors more appropriately discussed in a motion to bifurcate.

### 3. Fairness and Other Procedural Considerations

The FLSA is remedial in nature and therefore "'should be given a broad reading, in favor of coverage.'" Nerland, 564 F. Supp. 2d at 1025 (quoting Kelley v. Alamo, 964 F.2d 747, 749-50 (8th Cir. 1992)). Through § 216(b), Congress has stated a policy that plaintiffs claiming wage violations under the FLSA "should have the opportunity to proceed collectively" and that such collective actions allow the plaintiffs "the advantage of lower individual costs to vindicate rights by the pooling of resources." See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989) (discussing § 216(b) in the context of a collective action for violations of the Age Discrimination and Employment Act). The judicial system also benefits through the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged

12

[violative] activity." Id. Thus, FLSA collective actions operate to "serve the interests of judicial economy and to aid in the vindication of plaintiffs' rights." Freeman v. Wal-Mart Stores, Inc., 256 F. Supp. 2d 941, 944 (W.D. Ark. 2003).

While a defendant in a putative collective action under the FLSA has a right to defend against individualized claims on an individual basis, the courts have held that "this right must be balanced [against] the rights of the plaintiffs—many of whom would likely be unable to bear the costs of an individual trial—to have their day in court." Nerland, 564 F. Supp. 2d at 1026 (citing Glass v. IDS Fin. Servs., Inc., 778 F. Supp. 1029, 1081-82 (D. Minn. 1991)). Plaintiffs argue that the balance favors their collective action because it is likely that many of the named plaintiffs and opt-in plaintiffs will be unable to afford the costs of pursuing their claims without the benefit of pooled resources that a collective action affords. The Court agrees. From the record, it appears that many of the individual plaintiffs have claims with relatively small economic value, making it impracticable for them to pursue their claims individually. Therefore, decertifying the action could have the effect of contravening the remedial nature of the FLSA. Although concerns for the remedial nature of the FLSA, alone, are insufficient to justify allowing a case to proceed as a collective action, they do suggest that "a close call as to whether the plaintiffs are similarly situated should be resolved in favor of certification." Crawford v. Lexington-Fayette Urban County Gov't, No. 06-299-JBC, 2008 WL 2885230, at *11 (E.D. Ky. July 22, 2008) (citing Falcon, 580 F. Supp. 2d at 541).

Furthermore, permitting the case to proceed as a collective action will benefit the judicial system by the efficient resolution in one proceeding of common issues of law and fact. See Hoffmann-La Roche, 493 U.S. at 170. Liability will turn on the common question of whether

Qwest knew or should have known that technicians were working off-the-clock to comply with policies and meet QJD expectations. Resolving this question in one proceeding will conserve the resources of the Court and the parties.

The Court finds that the named plaintiffs and opt-in plaintiffs are similarly situated for purposes of collectively adjudicating their unpaid overtime claims. The factors typically considered in the second stage of the process for determining whether the plaintiffs are similarly situated all weigh in favor of allowing the case to proceed as a collective action. And to the extent that the question presents a close call, concerns for the purposes of the FLSA as a remedial statute tip the balance decidedly against decertification.

**B.      Objections to Judge Mayeron's R&R**[3]

A district court must make an independent, de novo review of those portions of an R&R to which a party objects[4] and "may accept, reject, or modify, in whole or part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); see also D. Minn. LR 72.2(b).

Plaintiffs object to Judge Mayeron's recommendation that 91 opt-in plaintiffs be dismissed with prejudice pursuant to Rule 37(b) and Rule 41(b) of the Federal Rules of Civil Procedure. R&R at 19, 22, 25-26, 29. Rule 37(b) authorizes a district court to impose sanctions on parties who fail to comply with discovery orders, including the sanction of "'enter[ing] a

---

[3] The factual and procedural background relevant to the issues raised by Plaintiffs' Objections to the R&R are described in detail in the R&R and are incorporated by reference.

[4] Plaintiffs do not object to the portion of Judge Mayeron's R&R recommending denial of Plaintiffs' Motion to Modify the Court's Second Amended Pretrial Scheduling Order [Docket No. 236].

dismissal or judgment by default.'" Gleghorn v. Melton, F. App'x 535, 537 (8th Cir. 2006) (quoting Edgar v. Slaughter, 548 F.2d 770, 772 (8th Cir. 1997)). Dismissal as a sanction is appropriate only when there is "(1) an order compelling discovery, (2) a willful violation of that order, and (3) prejudice to the other party." Schoffstall v. Henderson, 223 F.3d 818, 823 (8th Cir. 2000). While the sanction of dismissal is "'drastic'" and should therefore be used only in exceptional cases, Allen v. Tobacco Superstore, Inc., 475 F.3d 931, 936 (8th Cir. 2007) (quoting Chrysler Corp. v. Carey, 186 F.3d 1016, 1019-20 (8th Cir. 1999)), a district court is not required to impose the least onerous sanction so long as it considers whether a lesser sanction is available or appropriate, Keefer v. Provident Life & Accident Ins. Co., 238 F.3d 937, 941 (8th Cir. 2000).

The Federal Rules of Civil Procedure also authorize district courts to dismiss a case with prejudice when a plaintiff "fails to prosecute or to comply with these rules or a court order." Fed. R. Civ. P. 41(b). Like the requirement of willfulness for a dismissal under Rule 37(b), dismissal under Rule 41(b) also requires "'willful disobedience of a court order'" or the exhibition of a "pattern of intentional delay.'" Siems v. City of Minneapolis, 560 F.3d 824, 826 (8th Cir. 2009). The requirements of willful disobedience or exhibition of a pattern of intentional delay does not mean that a court must find that the plaintiff "acted in bad faith, but requires only that he acted intentionally as opposed to accidentally or involuntary." Hunt v. City of Minneapolis, 203 F.3d 524, 527 (8th Cir. 2000) (quotation omitted).

The 91 opt-in plaintiffs that Judge Mayeron recommended dismissing fall into four groups: (a) twelve opt-in plaintiffs (identified in Exhibit A of the October 30, 2008 Order to Show Cause [Docket No. 233] who failed to make themselves available for depositions or appear for a scheduled deposition; (b) 58 opt-in plaintiffs (identified in Exhibit B of the October 30,

15

2008 Order to Show cause) who failed to timely provide any answers to Qwest's interrogatories; (c) 25 opt-in plaintiffs (also identified in Exhibit B) who failed to timely provide *executed* answers to Qwest's interrogatories; and (d) seven opt-in plaintiffs (identified in the November 20, 2008 Order to Show Cause [Docket No. 262]) who failed to make themselves available for depositions or appear for a scheduled deposition.[5] See R&R at 13-28. Plaintiffs argue that dismissal of these opt-in plaintiffs with prejudice "is an inappropriately harsh sanction" that "eviscerates the remedial purpose of the FLSA." Objections at 8. Also, Plaintiffs contend, dismissal was inappropriate because the 91 opt-in plaintiffs did not "willfully" violate or disobey an order of the court and Qwest suffered no prejudiced.

### 1. Opt-in Plaintiffs Who Failed to Appear for Depositions

Two groups of opt-in plaintiffs (nineteen individuals) failed to makes themselves available for a deposition or appear for a scheduled deposition. Plaintiffs argue the dismal national economy during the fall of 2008, "coupled with an intense fear of retaliation for testifying against their current employer," caused the nineteen opt-in plaintiffs to feel they "could not afford to take time off work to attend their depositions." Objections at 9. Therefore, Plaintiffs conclude, the failure of these nineteen opt-in plaintiffs to comply with discovery orders was not willful. In response to this argument, Judge Mayeron wrote:

> [T]his Court is sympathetic to [the opt-in plaintiffs'] wishes not to miss work. However, they have the responsibility to participate in the cases that they have affirmatively brought before the Court. . . . In the end, subjecting oneself to some inconvenience of time or even pay, is inherent in any litigation a party decides to pursue. . . . Having affirmatively opted into this action, . . . these plaintiffs[,]

---

[5] Several opt-in plaintiffs fell into more than one of the four groups. In total, the R&R recommends dismissal of 91 opt-in plaintiffs.

16

> through their counsel[,] have agreed to the discovery procedure at issue. As such, they cannot sit on the side-lines and ignore discovery obligations imposed by this Court.

R&R at 16. The Court agrees with Judge Mayeron that a plaintiff has affirmative obligations as a litigant. And there is no evidence to substantiate Plaintiffs' proffered excuse that certain opt-in plaintiffs did not make themselves available because they feared retaliation by Qwest for participating in depositions. See id. As Judge Mayeron thoroughly explained, by failing to makes themselves available for a deposition or appear for a scheduled deposition, the nineteen opt-in plaintiffs violated more than one discovery order, despite warnings that failure to submit to a deposition could result in dismissal. The record establishes that the conduct of the nineteen opt-in plaintiffs was willful.[6]

Plaintiffs argue that even if the violations were willful, because there has been no prejudice to Qwest, dismissal with prejudice is not warranted. Plaintiffs argue that Qwest received executed interrogatories and deposed some of the opt-in plaintiffs, and, therefore, Qwest has not been prejudiced by the inability to depose these particular nineteen opt-in plaintiffs. But as Judge Mayeron explained:

> [T]his argument ignores the fact that the discovery at issue was designed to address the question of whether the opt-in plaintiffs are "similarly situated" to the named plaintiffs for the purpose of addressing [Qwest's] motion for class decertification . . . . In order to support the motion for decertification, [Qwest] must be given the opportunity to discover whether the opt-in plaintiffs are or are not similarly situated to the named plaintiffs.

---

[6] Plaintiffs also contend that Qwest's refusal to reschedule depositions after the deadlines had passed for these opt-in plaintiffs somehow minimizes the severity of their violations of the Court's orders. Qwest was under no obligation to reschedule depositions after the deadlines, and its refusal to do so is irrelevant to the issue before the Court.

Id. at 18. For example, being prevented from conducting timely depositions limits Qwest's ability to gather evidence that might reveal the presence of individualized defenses, which would be particularly relevant to the decertification motion and is a clear example of prejudice.

Finally, in considering the possibility of imposing a sanction less severe than dismissal, the Court is satisfied that such less severe sanctions were evaluated and properly rejected. Plaintiffs do not challenge, and the Court has no reason to question, Judge Mayeron's determination that given the multiple opportunities afforded to the opt-in plaintiffs to cure their discovery failures, a less severe sanction such as striking evidence or imposing a monetary fine is unlikely to "motivate those plaintiffs to provide the required discovery." Id. at 19.

For the above reasons, dismissal with prejudice of the opt-in plaintiffs who failed to make themselves available for depositions is appropriate under the circumstances.

### 2. Opt-in Plaintiffs Who Submitted No Responses or Unexecuted Responses

Plaintiffs argue that because approximately 75% of the opt-in plaintiffs timely submitted executed responses to the interrogatories, dismissal of those who did not is inappropriate. This argument was raised against dismissal of the opt-in plaintiffs who failed to appear for depositions. For the same reasons discussed above in rejecting that argument, the Court rejects the argument as it pertains to the opt-in plaintiffs who failed to submit executed responses to the interrogatories.

Plaintiffs cite Evans v. Lowe's Home Centers, Inc. in support of their argument. No. 3:03 CV 0438, 2005 WL 2100708 (M.D. Pa. Aug. 29, 2005). There, unlike here, the failure to respond to discovery did not occur in the face of an order to compel or an order to show cause. Id. at *1. Indeed, the Evans court specifically noted this circumstance in concluding that

18

dismissal was not warranted. Id. A case distinguished by the Evans court is more apposite to this case. In In re Food Lion, Inc., numerous opt-in plaintiffs failed to timely respond to discovery requests, even after they had been warned by the district court that failure to comply with deadlines could result in dismissal with prejudice. 151 F.3d 1029, 1998 WL 322682, at *11 (4th Cir. 1998) (unpublished). Also like here, the district court gave the non-compliant opt-in plaintiffs (some of whom were non-compliant for technical failures such as not having their responses notarized) an opportunity to show cause why their claims should not be dismissed. Id. The opt-in plaintiffs who did not proffer viable explanations or proffered no explanation at all were dismissed with prejudice. Id. The Fourth Circuit held that the district court was within its discretion in ordering dismissal. Id.

As explained in the previous discussion, Qwest was prejudiced by the failure of some opt-in plaintiffs to make themselves available for depositions and lesser sanctions were considered and appropriately rejected by Judge Mayeron. The reasons cited in arriving at these conclusions apply equally to the analysis of the failure of some opt-in plaintiffs to timely submit executed responses to interrogatories. Dismissal of these opt-in plaintiffs with prejudice is therefore warranted.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Qwest's Motion for Decertification [Docket No. 279] is **DENIED**;

2. Plaintiffs' Objections [Docket No. 309] are **OVERRULED**; and

3. Magistrate Judge Mayeron's Report and Recommendation [Docket No. 304] is **ADOPTED**.

BY THE COURT:

s/Ann D. Montgomery

ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: June 4, 2009