**ROBERT R. REINHART**
**(612) 340-7835**
**FAX (612) 340-2868**
**reinhart.robert@dorsey.com**

March 2, 2010

**<u>VIA ELECTRONIC MAIL</u>**

The Honorable Janie S. Mayeron
United States District Court
632 Federal Building
316 N. Robert Street
St. Paul, MN 55101

      Re:   *Brennan et al. v. Qwest Commc'ns. Int'l, et al.*, No. 07-cv-02024 (ADM/JSM)
              Plaintiffs Rule 34 Request to Inspect Premises

Dear Judge Mayeron:

      Qwest submits this letter brief in connection with a discovery dispute between the parties regarding Plaintiffs' request to enter upon Qwest's premises to conduct on-site inspections. Qwest respectfully requests that this Court (1) limit Plaintiffs from entering or videotaping Qwest service garages at start-of-shift times when garages are crowded with technicians needing to promptly leave these facilities to meet customer service commitments, and (2) order inspections not to exceed 90 minutes and to occur between the hours of 11:00 a.m. and 3:00 p.m., when they would be less distracting and disruptive.[1]

      Plaintiffs have made a request under Federal Rule of Civil Procedure 34(a)(2) to enter upon the premises of three Qwest garages "for the purposes of inspection, measuring, surveying, photographing and videotaping the parking lot, entrances, exits, hallways, locker rooms, time-clocks, lunch-room, break-room, rest-room, vehicle storage/garage area, vehicle preparation area, product storage/stock areas, and all areas regularly accessed by non-exempt workers . . . at 7:30 a.m." *See* Exh. A. Qwest promptly responded to Plaintiffs' request by asking for several reasonable conditions in order to limit disruption to Qwest's operations, including, among others, that inspections occur between the hours of 11:00 a.m. and 3:00 p.m. (when garages are less busy), be performed by two persons who have signed a confidentiality agreement and release, and not include videotaping of sensitive areas or Qwest employees who request not to be videotaped. *See* Exh. B. Plaintiffs reacted to Qwest's reasonable requests by demanding, among other things, that inspections begin at 7:30 a.m. and that the activities occurring during that busy time be videotaped. *See* Exh. C. Plaintiffs' counsel also

---

[1] These issues are the two remaining significant points of contention regarding Plaintiffs' Rule 34 request. The parties have negotiated and reached agreement regarding other secondary issues, including (1) the number of individuals who may conduct the inspections, (2) what notice is required, (3) the presence of Qwest escorts, (4) limitations on videotaping sensitive areas and non-consenting individuals, and (5) Plaintiffs' production of photographs and video footage. The parties should be able to work through any other secondary issues, identified in the attached correspondence, that may remain.

March 2, 2010
Page 2

asserted in a telephone conversation with Qwest's counsel that Plaintiffs sought in the request to videotape Qwest employees' start-of-shift activities (for shifts beginning at 8:00 a.m. and 4:00 p.m.), including employees meeting with supervisors and readying their trucks.

Rule 34 permits a party to request entry onto another party's premises "so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it."  The request must (1) describe with reasonable particularity item to be inspected; and (2) specify a reasonable time, place, and manner for the inspection.  *See* Rule 34(b)(1)(A) & (B).  As for the scope of permissible discovery, the threshold is much higher than ordinary relevancy.  Because entry onto another's premises "may entail greater burdens and risks than mere production of documents, a greater inquiry into the necessity for inspection [is] warranted."  *Belcher v. Bassett Furniture Indus., Inc.*, 588 F.2d 904, 908 (4th Cir. 1978).  The court must apply a balancing test, measuring "the degree to which the proposed inspection will aid in the search for truth . . . against the burdens and dangers created by the inspection."  *Id.*; *see also id.* at 908 n.12 ("[A]ny . . . invasion of a person's property rights [for discovery purposes] must . . . be judged with care." (quotations omitted)).

To the extent Plaintiffs are entitled to inspect Qwest's premises, Qwest believes it is reasonable and appropriate for such inspections to take place at times that will not disrupt Qwest's operations and for inspections to be limited to the observation, measurement, and recording of physical facilities in Qwest's garages.  It is unreasonable, unnecessary, and overly burdensome, however, for Plaintiffs to conduct inspections that disrupt Qwest's operations during its busiest times of day and to videotape Qwest employees engaged in start-of-shift activities at select garages.  Plaintiffs are able to testify (and have done so) regarding their own start-of-shift activities.  Having outsiders in Qwest's facilities armed with cameras at the times identified in Plaintiffs' notices will be too disruptive to Qwest's ability to meet its time-sensitive public responsibilities and customer commitments, as well as to Qwest employees who are not parties to this lawsuit.[2]

**1.    Videotaping start-of-shift activities will not aid in proving or disproving Plaintiffs' class claims.**

To justify their inspection requests, Plaintiffs must first show the inspections would "aid in the search for truth."  *Belcher*, 588 F.2d at 908.  They cannot make this showing for three

---

[2]   In addition, the union representing Qwest's Minnesota network technicians has shared with Qwest that it strongly objects to and opposes filming of union members in the workplace, asserting that such surveillance raises issues of mandatory bargaining.  The union's objection serves as an additional reason the Court should hesitate to permit on-site videotaping in the absence of any good explanation why the resulting disruption at the busiest time of the workday in the relatively confined quarters of Qwest's garages is necessary, given the insignificance of such isolated snapshots and the irrelevance of the start-of-shift activities to the QJD issues that are to be the sole focus of the Stage 1 trial.

March 2, 2010
Page 3

reasons. First, and most fundamentally, at this stage of the case, Plaintiffs are attempting to prove that network technicians were forced to work off-the-clock, as a class, because of QJD, and that Qwest had actual or constructive knowledge of these facts. *See* Docket No. 362 at 2. Filming work activity at the start of a shift has nothing to do with the issues to be contested in the Stage 1 trial.

Second, videotape footage of partial start-of-shift activities performed by just a few technicians on 3 days at 3 of over 100 locations from which Minnesota network technicians are based is not representative of Plaintiffs' activities as a whole. Any evidence offered by Plaintiffs with respect to individual plaintiffs must be representative of the group of Minnesota network technicians – or at least all plaintiffs – as a whole in order to have any worth. Videotape footage during three mornings of a handful of individual network technicians (most of whom will not be plaintiffs) at three garages certainly has no value in demonstrating how long any plaintiff worked on those three days, much less any other day, and it will have nothing to do with showing whether anyone was not paid for any work. It certainly will have nothing to do with demonstrating whether the 179 plaintiffs working across the state throughout the relevant period of up to five years or more were forced to work off-the-clock *as a class*, or that Qwest had knowledge of that work.

Finally, even if the haphazard start-of-shift videotape footage were somehow representative, Plaintiffs do not need it. First, they and others can testify (and have done so in numerous depositions) about their individualized start-of-shift activities and their observations of those of others. *See, e.g.*, R. Meyer Dep. at 15:23-17:19; K. Bandel Dep. at 13:19-15:4; H. Smith Dep. at 66:22-67:10; B. Weisert Dep. at 40:2-11. Second, as the deposition testimony has demonstrated, network technicians follow no set routine or practice that requires filming to communicate or understand. Accounts and experiences clearly differ. Courts have limited on-site inspections when more reliable evidence can be and has been less-intrusively obtained. For example, in *Vennet v. American Intercontinental University Online*, 2007 WL 4442321 (N.D. Ill. Dec. 13, 2007), the plaintiffs alleged they had not been paid proper overtime compensation. They sought an on-site inspection "in order to obtain evidence, including photographs, to support that supervisors could see that employees were at their work stations working overtime." *Id.* at *3. The court denied the inspection request, holding that "Plaintiffs' testimony about the arrangement of the office and their interaction with supervisors is sufficient." *Id.* at *3. Similarly, in *Belcher*, the court denied an on-site inspection because the information sought could more easily be learned from interrogatories and depositions. 588 F.2d at 908-09.

In this case, Qwest has offered access to its premises under reasonable terms. Alternative and more trustworthy methods of discovery exist and have already been used by Plaintiffs. *See DUSA Pharms., Inc. v. New England Compounding Pharm., Inc.*, 232 F.R.D. 153 (D. Mass. 2005). Therefore, Plaintiffs cannot show that the extraordinary imposition of intruding upon Qwest garages and videotaping during start-of-shift activities is justified in this case.

March 2, 2010
Page 4

**2.    The burdens created by Plaintiffs' proposed inspections during start-of-shift times outweigh any alleged benefits to Plaintiffs.**

Qwest has agreed to provide considerable access to its garages. But while Plaintiffs are entitled to observe, measure, and record Qwest's premises, Plaintiffs are not entitled to disrupt Qwest's work processes and personnel, especially non-plaintiff technicians, by scheduling inspections for the busiest times in the garages.

Courts repeatedly have limited on-site inspections so as not to disrupt a defendant's operations. In *Banks v. The Interplast Group, Ltd.*, 2003 WL 21185685, at *1 (S.D. Tex. Apr. 16, 2003), the court granted an on-site inspection for the plaintiff to photograph office locations to prove supervisor awareness of alleged harassment, but ordered plaintiff "to take reasonable care to avoid interfering with [the defendant]'s operations." In *Welzel v. Bernstein*, 233 F.R.D. 185, 186-87 (D.C.D.C. 2005), the court granted a similar inspection request but limited it to one hour. And in *Peterson v. Union Pacific Railroad Co.*, 2007 WL 3232501 (C.D. Ill. Nov. 1, 2007), the court ordered an inspection of the defendant's train crossing to occur during the two hours when rail traffic would not be disrupted.

There is no doubt Plaintiffs' inspections – whenever they occur – will disrupt Qwest's operations. Nonetheless, Qwest has offered Plaintiffs to conduct those inspections between the hours of 11:00 a.m. and 3:00 p.m. in order to limit the inevitable disruptions to times when Qwest's garages are less busy and not so filled with non-plaintiff technicians having no connection to this case (and who, Plaintiffs must admit, would simply interfere with their requested inspections). Since Plaintiffs profess to need access simply to observe, measure, and record the physical facilities in Qwest's garages, the time of day when the inspection occurs should not matter to Plaintiffs.

For all of these reasons, Qwest respectfully requests that the Court (1) limit Plaintiffs from videotaping start-of-shift activities at Qwest's garages, and (2) order inspections not to exceed 90 minutes and to occur between the hours of 11:00 a.m. and 3:00 p.m.

Very truly yours,

s/Robert R. Reinhart

Robert R. Reinhart

RR/jaw
cc:   Matt Morgan (*via electronic mail*)