## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Lyle Brennan, Christopher Richard, and Michael Lundell, on behalf of themselves and other individuals similarly situated,

                    Plaintiffs,

v.

Qwest Communications International, Inc., Qwest Communications Corporation, and Qwest Corporation,

                    Defendants.

Civil File No. 07-cv-02024 ADM/JSM

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF RULE 56(d) MOTION AS TO THE "QJD THEORY"

DORSEY & WHITNEY LLP
Robert R. Reinhart #90566
Melissa Raphan #182795
Ryan E. Mick #311960
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
reinhart.robert@dorsey.com
raphan.melissa@dorsey.com
mick.ryan@dorsey.com

ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

Page #

TABLE OF AUTHORITIES ......................................................................... iii

I.    INTRODUCTION ............................................................... 1

II.   PROCEDURAL HISTORY ................................................ 3

III.  STATEMENT OF FACTS ................................................. 4

      A.    The parties. ................................................................... 4

      B.    Qwest's policies and practices prohibit off-the-clock work. ...... 5

      C.    Network technicians report their own payroll time on an honor system. ...... 5

      D.    Qwest pays for every minute of reported overtime. ................... 7

      E.    Qwest invested immense resources to develop a fair and effective
            performance enhancement program, including QJD. ................. 8

            1.    The QJD system is grounded in sound principles. ......................... 9

            2.    QJD targets were developed from analyses of historic technician
                  performance data. ......................................................... 11

            3.    Qwest tested the QJD concept, and re-validated its data, before
                  holding technicians accountable. .................................... 12

            4.    QJD was designed for flexibility. .................................... 13

            5.    QJD was designed, and its targets set, appropriately and fairly. ...... 15

      F.    Qwest's "out of garage rule" imposes no significant burden on technicians. 17

IV.   ARGUMENT ................................................................. 18

      A.    The Rule 56 Standard ................................................... 18

      B.    Plaintiffs have indicated that they do not intend to rely on the QJD theory
            identified by the Court. ................................................ 19

      C.    Plaintiffs have no specific, substantial evidence that QJD forced class-wide
            unpaid work. ........................................................... 20

1.     Plaintiffs' burden to show that QJD forced unpaid work is necessarily heavy. ........................................................................ 21

2.     Regardless of the standard, undisputed evidence conclusively shows that QJD did not force class-wide unpaid overtime. ....................... 22

3.     Undisputed evidence that QJD targets are achievable precludes class-wide proof that QJD forced off-the-clock work. .................... 22

4.     The variability of QJD expectations precludes proof that technicians were uniformly compelled to work unpaid overtime. .................... 24

D.     Plaintiffs have no substantial evidence that Qwest knew or should have known that QJD allegedly forced off-the-clock work. ............................ 26

1.     Plaintiffs have no substantial evidence that Qwest actually knew that QJD forced class-wide unpaid overtime. ......................................... 26

2.     Plaintiffs' QJD theory precludes proof of knowledge. ................... 27

3.     Qwest had no reason to know about alleged class-wide unpaid overtime allegedly forced by QJD when Plaintiffs' union never filed grievances alleging that such unpaid work was occurring. ............. 30

4.     Other evidence disproves knowledge of class-wide unpaid work, much less unpaid work compelled by QJD. ................................... 30

E.     Plaintiffs have no evidence that the "out-of-garage rule" forced class-wide off-the-clock work, much less that Qwest should have known about it. ..... 32

V.     CONCLUSION ................................................................................. 33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................... 19

*Bailey v. County of Georgetown*,
94 F.3d 152 (4th Cir. 1996) ......................................................................... 26

*Berger v. Cleveland Clinic Found.*,
2007 WL 2902907 (N.D. Ohio Sept. 29, 2007) .......................................... 31

*Bjornson v. Daido Metal U.S.A., Inc.*,
12 F.Supp.2d 837 (N.D. Ill. 1998) ............................................................... 31

*Blanc v. Safetouch, Inc.*,
2008 WL 4059786 (M.D. Fla. Aug. 27, 2008) ............................................ 29

*Davis v. Food Lion*,
792 F.2d 1274 (4th Cir. 1986) .................................................................27, 28

*Enter. Bank v. Magna Bank*,
92 F.3d 743 (8th Cir. 1996) ......................................................................... 18

*Forrester v. Roth's I.G.A. Foodliner, Inc.*,
646 F.2d 413 (9th Cir. 1981) ....................................................................... 28

*Gaylord v. Miami-Dade County*,
78 F.Supp.2d 1320 (S.D. Fla. 1999) ............................................................ 29

*King v. CVS/Caremark Corp.*,
2008 U.S. Dist. LEXIS 108614 (S.D. Fla. Sept. 11, 2008) ......................... 31

*Krenik v. County of Le Sueur*,
47 F.3d 953 (8th Cir. 1995) ......................................................................... 19

*McGlothan v. Walmart Stores, Inc.*,
2006 WL 1679592 (M.D. Fla. June 4, 2006) .............................................. 29

*Millington v. Morrow Cty Bd. of Comm'rs*,
2007 WL 2908817 (S.D. Ohio Oct. 4, 2007) .............................................. 31

*Perez v. Safety-Kleen Sys., Inc.*,
253 F.R.D. 508 (N.D. Cal. 2008) ................................................................. 23

*Pforr v. Food Lion*,
    851 F.2d 106 (4th Cir. 1988) ................................................................... 26

*Prince v. MND Hospitality, Inc.*,
    2009 WL 2170042 (S.D. Tex. July 20, 2009) ......................................... 29

*Robertson v. Board of County Comm'r*,
    78 F.Supp.2d 1142 (D. Co. 1999) ........................................................... 28

*Seever v. Carrols Corp.*,
    528 F.Supp.2d 159, 170 (W.D.N.Y. 2007) ............................................. 28

*Uhler v. Galesi Mgmt. Corp.*,
    1999 WL 20949 (N.D. Tex. Jan. 8, 1999) ............................................... 29

*Von Friewalde v. Boeing Aerospace Operations, Inc.*,
    2009 WL 2391400 (5th Cir. Aug. 4, 2009) ............................................. 31

*Whitaker v. Pac. Enter. Oil Co.*,
    1992 WL 44729 (10th Cir. Mar. 9, 1992) ............................................... 31

*White v. Starbucks Corp.*,
    497 F.Supp.2d 1080 (N.D. Cal. 2007) ...............................................31, 32

*Wood v. Mid-America Mgmt. Corp.*,
    2006 WL 2188706 (6th Cir. Aug. 1, 2006) ............................................. 31

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) .................................................................................... 18

Fed. R. Civ. P. 56(d) .................................................................................... 4

## I.    INTRODUCTION

The Court has made clear that the viability of Plaintiffs' collective action for alleged unpaid overtime under the Fair Labor Standards Act ("FLSA") turns on what it has coined the "QJD theory."  Indeed, the Court has set a Phase II Stage I trial to test Plaintiffs' ability to satisfy the two elements of the QJD theory:  (1) Did Qwest's QJD targets (or other policies) force technicians, as a class, to work unpaid overtime?; and (2) Did Qwest know, or should it have known, that its QJD targets (or other policies) would force technicians, as a class, to work unpaid overtime?  If Plaintiffs cannot establish **both** of these elements, the Court indicated that decertification is likely appropriate.

Much has transpired since the Court denied Defendants' motion to decertify. Fundamentally, the parties have shifted their focus to the "QJD theory" identified by the Court.  In that context, each plaintiff has responded under oath to a survey through which his claims, and the evidentiary basis for them, have been subjected to scrutiny.  Scores of depositions have been taken.  Experts have provided extensive written reports and have been deposed.  As a consequence, the current record is far more comprehensive and compelling.  Given this record, while it first may have appeared to the Court that issues of credibility could necessitate trial, it is now clear that Plaintiffs cannot establish either element of the QJD theory, as a matter of law.  Therefore, Qwest moves for partial summary judgment as to the elements of the QJD theory.

This brief will explain the absence of evidence to support the elements of the QJD theory.  But the QJD theory fails, fundamentally, because it hinges on the legally untenable propositions that (1) workers are entitled to sue for overtime pay for work they

intentionally hid from their employer despite the employer's policy that employees report time accurately; and (2) they can justify misrepresenting their hours on the subjective notion that their employer sets its expectations too high or measures their accomplishments unfairly. The FLSA does not impose on employers a subjective duty of fairness. It imposes the obligation to pay for known work; not hidden work.

This is not a case where Plaintiffs can show that Qwest demanded an unrealistic amount of work without allowing overtime. Three years of discovery has failed to uncover any example, much less any systemic pattern, of technicians being punished for reporting overtime; being denied the opportunity to report overtime work; or not receiving full overtime pay for all reported work. Uncontrovertable evidence is squarely to the contrary. Qwest actually bargains for the contract right, which it frequently must exercise, to *require* overtime. All Plaintiffs were not only free to report and be paid for overtime, they were unambiguously and repeatedly directed to do so. *And they did.* The overwhelming majority of plaintiffs in this case were **each** paid for hundreds – in some instances thousands – of hours of overtime. Indeed, several Plaintiffs, including one "representative" Plaintiff, individually, reported more than 2,000 hours of overtime during the time period they claim they were "forced" to work off the clock by QJD.

Against this, Plaintiffs have no substantial, objective evidence to establish that Qwest's productivity expectations forced unpaid overtime, with Qwest's consent. This conclusion does not – and should not – turn on matters of subjective personal perception or credibility. It is driven by the simple fact that QJD expectations were based not on some executive's arbitrary ambition, but rather on the actual immediate past track record

of the technicians themselves, including Plaintiffs.

The indisputable record now before the Court is that QJD merely functioned as a means by which Qwest could objectively identify the lowest performing technicians for the legitimate business purpose of channeling more coaching and training help to them. QJD is and always has been a tool to serve the essential business purpose of more effectively measuring and thereby managing and improving technicians' productivity and performance, in a highly competitive industry which demands prompt, effective customer service.

Plaintiffs are equipped, at best, to object to accountability for their use of time. They have no experts to rebut expert opinion discrediting their QJD theory. They point to no external or internal benchmarks of productivity expectations they would not find objectionable. They fail to produce any admissible, objective evidence to support their key theory. They simply object that some jobs are harder than others, ignoring that this has always been the case and that comparisons of their productivity to historical averages of the actual past performance of themselves and their peers is inherently reasonable and could not possibly force class-wide unpaid overtime in any meaningful sense.

## II.    PROCEDURAL HISTORY

On March 25, 2008, the Court granted Plaintiffs' motion for conditional class certification. On June 4, 2009, the Court denied Qwest's motion for decertification. The Court held that ongoing collective treatment was justified based on two "class-wide" questions: (1) Did Qwest's QJD targets (or other policies) force technicians, as a class, to work unpaid overtime?; and (2) Did Qwest know, or should it have known, that its QJD

targets (or other policies) would force technicians, as a class, to work unpaid overtime? *See* June 4 Order at 12.   Apart from QJD, the only other Qwest policy identified as a basis for ongoing class treatment was the "out-of-garage rule" under which technicians have been recommended to leave the garage 15-30 minutes[1] after the start of their shifts.

The Court subsequently clarified its June 4 Order, including the significance of the "QJD theory" for the remainder of the case:

> Plaintiffs have advanced a theory that (1) the technicians who are plaintiffs in this case were all subjected to QJD, as well as other requirements and expectations, that forced them to perform off-the-clock work; and (2) Qwest had actual or constructive knowledge that QJD and the other requirements and expectations were causing the technicians to perform this off-the-clock work.  [This QJD theory] is critical to the viability of the unpaid overtime claims. … [I]f the factfinder is not persuaded by the QJD theory … Plaintiffs would have failed to prove that the named and opt-in plaintiffs were all the victims of a common decision, policy, or plan that violated the FLSA.  If this were to be the finding, the Court would then entertain a decertification motion.

Order (August 21, 2009).  Because the record is now clear that Plaintiffs lack substantial evidence to establish the elements of their "QJD theory," Qwest moves for partial summary judgment as to those issues, pursuant to Fed. R. Civ. P. 56(d).

## III.   STATEMENT OF FACTS

### A.   The parties.

Qwest is a telecommunications company that provides several products to business and residential customers, including phone service, long distance, and internet access.  June 4 Order at 2.  Plaintiffs are current and former Qwest network technicians

---

[1]   The amount of time has varied depending on the time period at issue, the specific job title, and individual supervisors' practices.

employed in Minnesota. *Id.* Plaintiffs' responsibilities often vary greatly due to specialized work, but generally include the installation, maintenance, and repair of various elements of Qwest's communications network. *Id.* Minnesota network technicians report to over 140 different garages, central offices and other work locations, and have worked for over 140 different supervisors during the class period. *See* Trujillo Aff., at ¶ 4; Lester Aff., ¶ 6; Buchholz Aff., ¶¶ 2, 5; Weaver Aff., ¶¶ 2, 4.[2]

### B.   Qwest's policies and practices prohibit off-the-clock work.

Plaintiffs do not dispute that Qwest's policies unequivocally prohibit off-the-clock work and require technicians to report their compensable time accurately. *See* Coddington Aff., ¶¶ 8-9 & Exs. A-D; Miles Aff., ¶¶ 5-7 & Exs. A-E. Network technicians are trained annually regarding Qwest's expectations. *See*, *e.g.*, Christopherson Dep. at 59. Plaintiffs admit no Qwest rule or policy has prevented them from reporting their time accurately. *See* Brooks Dep. at 67 ("Q. Is there any Qwest rule or policy that actually prevents technicians from entering all of their time accurately? A. No."); Mick Aff., Appx. 1.

### C.   Network technicians report their own payroll time on an honor system.

Because of the nature of network technicians' independent field responsibilities, Qwest cannot effectively monitor the accuracy of technicians' self-reported time. Technicians are not like assembly line workers who often prepare to work and perform their duties as a group in a single location. Supervisors are limited in their ability to

---

[2]   Citations to depositions and affidavits from earlier briefs are included here for ease of reference. Deposition excerpts are set forth as exhibits to the Mick Affidavit.

monitor technicians' activities in the garages before and after their shifts.  In many instances, a technician reports to a location where there is no supervisor.  *See* Mick Aff., Appx. 2.  In other instances, the supervisor works different hours and is not present when the technician reports for work or returns to the garage at the end of the day.  *See* Mick Aff., Appx. 3.   Even if they are present, supervisors cannot practicably observe technicians in the multiple areas where technicians may do work-related activities, much less in all areas at the same time.  *See* Vooge Dep. at 62-63 ("Q.  How frequent were those days where you would literally from start to end have no contact with your supervisor?  A.  I would say very much more the norm."); Mick Aff., Appx. 4.

Supervisors also cannot monitor technicians' activities in the field.  It simply is impossible for supervisors to observe multiple technicians visiting multiple customer locations each day.  *See* Kirby Dep. at 27 ("Q.  How frequently does your supervisor oversee your work in the field?  A.  Never."); Endres Dep. at 30 ("Q.  How often would your supervisor oversee your work in the field?  …  A.  I bet in the last five years, he's probably checked my work five times.");  Mick Aff., Appx. 5.

Qwest does not use any automated systems that could force technicians to be paid in a manner inconsistent with their actual work time.  Rather, technicians are empowered to personally enter their total work time at the end of each shift, essentially filling in the numbers themselves on their own paychecks.  *See, e.g.,* Kanada Dep. at 46.  Supervisors approve technicians' time entries, but because supervisors cannot closely monitor technicians' work, Plaintiffs readily admit that Qwest trusts them to enter their own payroll time accurately, the same way Qwest trusts them to act safely and honestly as

they interact with members of the public and enter customers' homes and businesses.  *See id.* at 53-54 ("Q.  So was there any way for your supervisor to know exactly how much time you were working during a given day?  ….  A.  [T]he only way they would know exactly what you were doing out there [is] if they actually come out to see you.  I mean they assume that you're out there working …."); Laiti Dep. at 65 ("Q.  Is it fair to say your supervisors trust you to be accurate in the time you report?  A.  Yes."); Mick Aff., Appx. 6-7.

   **D.   Qwest pays for every minute of reported overtime.**

   Far from condoning unpaid work, Qwest often *requires* network technicians to work overtime to meet customer commitments and pays for that overtime at or above the premium required by the FLSA.  *See* Coddington Aff., Ex. E.  Qwest also provides Plaintiffs with the opportunity to take up to one hour of "incidental" overtime per day, generally without prior supervisor authorization, to finish their daily work.  *See* Lester Supp. Aff., ¶ 14.  Plaintiffs can request additional overtime, as necessary, to ensure they are properly paid for their work, and Plaintiffs have testified that they either received permission to work extra overtime or were allowed to leave the work unfinished, without adverse consequences.  *See id.*, ¶ 15; Mick Aff., Appx. 13.  Plaintiffs also have available voluntary overtime.  *See* Lester Supp. Aff., ¶ 15.  Regardless of how it is characterized, Plaintiffs have the ability to self-report all overtime, regardless of when or how it is worked, to ensure they are paid for all of their work.  *Id.*  Qwest regularly pays every penny of overtime self-reported by network technicians.  *See* Vooge Dep. at 64 ("Q.  Was there any instance when you were at Qwest where you submitted overtime but you

weren't paid the overtime?  A.  No."); Kloos Dep. at 102 ("Q.  Would you agree with me that the time that you did report when you worked at Qwest, regular time and overtime, that you were paid for all of the time you reported?  A.  Yes."); Mick Aff., Appx. 14. Many Plaintiffs, *individually*, have reported thousands of hours of overtime and have been paid tens of thousands of dollars in overtime compensation for the time period during which they claim they were "forced" to work unpaid overtime.  *See* Newsome Aff., ¶¶ 4-5 & Ex. A (*e.g.*, Joel Briggs, 2835 hours; Joseph Knapp, 2918 hours; Ronald Puppe, 3644 hours; Matthew Simanski, 2812 hours; Dennis Vanselow, 2386 hours).

   **E.    Qwest invested immense resources to develop a fair and effective performance enhancement program, including QJD.**

   Business dynamics have changed immensely in the telecommunications industry in recent years.  Like other companies, Qwest, once a regulated monopoly, became a partially deregulated company facing new competitive pressures.  As explained by expert John Berringer, who has worked in the telecommunications industry for decades (though never for Qwest), the last 10 years have been a period of major transition for companies like Qwest, which have been forced to revise their business models and, among other changes, find new ways to coach employees to become more productive.  Berringer Aff., ¶¶ 7-8.    To that end, Qwest devoted extensive time and effort to develop its comprehensive "Performance Enhancement Program" ("PEP"), of which QJD is a component.

   QJD is not a stand-alone system.    QJD is the performance measurement component of the PEP that Qwest developed to focus resources on developing stronger

technician performance and enhancing relationships between technicians and management, in order to improve productivity, quality and customer service. *See* Peirce Sec. Supp. Aff., ¶ 4. The PEP's primary purpose has never been to impose discipline on network technicians for failing to meet performance targets. *Id.*, ¶ 5 & Ex. A at 4 ("Disciplinary action is not the goal; helping our technicians and supervisors to succeed is."). While discipline may be necessary in some instances to provide consequences for inadequate performance (a reality in any organization), the purpose of the PEP is to recognize strong performers and equip supervisors to communicate effectively with poorer performers, provide them constructive feedback, and give them the necessary tools to perform their work successfully. *Id.*, ¶ 5.

### 1.   The QJD system is grounded in sound principles.

In conjunction with the development of the PEP, starting in late 2003 and early 2004, Qwest developed the QJD[3] performance measurement system to replace the existing metric, PowerScore. *See* Peirce Sec. Supp. Aff., ¶ 6. PowerScore was regarded as too confusing and failed to consider the reality of technicians' actual day-to-day work. *Id.* For example, certain types of jobs were not included in the PowerScore analysis. *Id.* As a result, PowerScore was not uniformly used by different local operations groups. *Id.* Thus, Qwest decided to develop a more straightforward metric to use in implementing the PEP. *Id.*

Qwest established a team with representatives from network operations staff, field

---

[3]   The metric was initially named "Effective Jobs per Day," or "EJD," and later renamed QJD. This memorandum will refer generally to this metric as QJD.

personnel, and labor relations personnel to develop the QJD system in conjunction with the PEP.  *See* Peirce Sec. Supp. Aff., ¶ 2.  This team worked from several basic principles.  First, QJD should reflect both technician productivity and quality.  *Id.*, ¶ 7.  The productivity component would focus on jobs completed in 8 hours of payroll time.  *Id.*  The quality component would take into account "repeats," or instances in which a customer placed a second request for service associated with a technician's prior work within 30 days of a job completion.  *Id.*, ¶ 7 & Ex. A at 5 ("In plain English, [QJD] measures real productivity:  how productively did the technician do jobs that did not need to be redone by somebody else.").

Second, in order to ensure fair and accurate application of the QJD metric, QJD targets would be set for different "buckets," reflecting different categories of work performed by different kinds of network technicians.  *See* Peirce Sec. Supp. Aff., ¶ 8.  Technicians would not be held accountable to any generic "jobs per day" metric.  *Id.*  Rather, technicians would be scored *only* in buckets in which they had completed a sufficient number of jobs for the reporting period, in order to avoid technicians being measured for work with which they were unfamiliar, or on the basis of aberrational work assignments.  *Id.*  Different metrics also would be established for each state network organization, and later for each director, to ensure that technicians would be held accountable to standards that accurately reflected reasonable expectations for their productivity.  *Id.*

Third, underlying QJD was the principle that supervisors and managers would have discretion to manage technicians appropriately, such as by granting exceptions when

circumstances warranted, to ensure fair and accurate application of QJD to each technician's individual situation.   *See* Peirce Sec. Supp. Aff., ¶ 9 & Ex. A at 51 ("Reminder:  *Disciplinary action is always subject to review of circumstances of each situation and may differ given all situational factors.*"); Mick Aff., Appx. 43.

> **2.    QJD targets were developed from analyses of historic technician performance data.**

Having developed the basic rules for calculating QJD, the core team next developed preliminary proposals for actual QJD metrics for each "bucket" and network group.   *See* Peirce Sec. Supp. Aff., ¶ 12.   First, the team determined how many jobs would be required to qualify for a QJD score in each bucket.   *Id.*   Using the same rules to assign jobs to each bucket that would be used prospectively, the team analyzed technician performance data from the prior 18 months and created histograms of jobs per month/per technician for each bucket.   *Id.*   The core team actually commissioned two separate programmers to independently develop programming to analyze the historic performance data to ensure accurate analysis.   *Id.*   These analyses allowed the team to eliminate outliers (technicians who were either particularly strong or particularly weak performers, whose data might skew the analysis) and focus on a realistic measure of the average number of jobs that most technicians doing that work were completing on a monthly basis.   *Id.*   After the data analyses were complete, the team then sought input from operations managers to confirm that the analyses were consistent with realities in each network organization.   *Id.*, ¶ 13.   As a result of these analyses and follow up inquiries, the minimum jobs per month to qualify for scores in each bucket were established.   *Id.*

After determining the minimum number of jobs that would qualify for a QJD score in each bucket, the team next calculated historical jobs-per-day results for only those technicians who would have qualified in each bucket; that is, the technicians whose work patterns demonstrated familiarity with the kind of work in each bucket. *See* Peirce Sec. Supp. Aff., ¶ 14. Again, the team analyzed technician performance data from the prior 18 months, using two independent programmers as a quality check, and created histograms of jobs per day/per technician for each bucket, to eliminate outliers. *Id.* The team then again sought input from operations managers to verify the data analyses. *Id.* The team also sought out, albeit unsuccessfully, input from the Communication Workers of America, the union representing Qwest technicians. *Id.* Finally, the team divided the jobs-per-day results into percentiles for each local organization and set proposed targets for "satisfactory" performance for each bucket in each organization at approximately the 50th percentile of recent technician performance. *Id.* Based on these proposals, each local organization set its own "satisfactory" target for the QJD roll out period, at roughly the 50th percentile, taking into consideration local factors that suggested that higher or lower targets were appropriate. *Id.*; Lester Supp. Aff., ¶ 6. These initial QJD targets were rolled out in or about July 2004. *Id.*, ¶ 7.

### 3. Qwest tested the QJD concept, and re-validated its data, before holding technicians accountable.

Although the initial QJD targets were communicated to the field in July 2004, technicians were not held accountable to those targets. *See* Peirce Sec. Supp. Aff., ¶ 15; Lester Supp. Aff., ¶¶ 7-8. Rather, Qwest introduced the targets in the context of a 6-

month grace period during which technicians and field management were given an opportunity to learn the targets and adjust expectations accordingly. *Id.* During this period, the core team also re-ran the jobs-per-month and jobs-per-day analyses, based on data from the period following the initial roll out. *See* Peirce Sec. Supp. Aff., ¶ 15. The team's new analysis validated its prior work. *Id.* Only after the conclusion of the 6-month grace period and the re-validation of the historical analyses was QJD fully implemented. *See* Peirce Sec. Supp. Aff., ¶ 15; Lester Supp. Aff., ¶ 8.

Even after QJD was implemented, however, technicians were not held accountable immediately. *See* Peirce Sec. Supp. Aff., ¶ 16; Lester Supp. Aff., ¶ 8. Under the initial QJD system, performance data was analyzed on a 3-month rolling basis. *Id.* It was only 3 months after the implementation of QJD that technicians were scored against their targets. *Id.* Thus, technicians had a full 9 months after the initial rollout before they were subject to the possibility of discipline. *Id.* Likewise today, new technicians, or technicians who transfer, are given a 6 month grace period before they are held accountable to their new QJD targets. *See* Peirce Sec. Supp. Aff., ¶ 17; Lester Supp. Aff., ¶ 9.

### 4.     QJD was designed for flexibility.

Even after QJD was implemented, it was not enforced without appropriate consideration for technicians' individual circumstances. *See* Peirce Sec. Supp. Aff., ¶ 18; Lester Supp. Aff., ¶ 10. Although the preliminary "satisfactory" target was set at or about the 50th percentile of historical performance of Qwest technicians in each bucket, technicians were not disciplined if they failed to reach it. *Id.* Initial efforts were only

made to manage the bottom 10-30% of performers in each bucket in each organization, and of those, only the bottom 10-15% were generally subject to discipline.  *See* Lester Supp. Aff., ¶ 10.  This fundamental principle – that technicians are not automatically subject to discipline simply because they fall short of a "satisfactory" target – has remained in effect to the present.  *See* Peirce Sec. Supp. Aff., ¶ 18; Lester Supp. Aff., ¶ 11.  Thus, although Qwest has since stratified QJD expectations into multiple performance levels (*i.e.*, "Outstanding," "Satisfactory," "Less than Satisfactory," "Needs Improvement" and, later, "Unacceptable"), *see* Peirce Sec. Supp. Aff., ¶ 18, technicians are not subject to disciplinary steps unless they fall short of the "Needs Improvement" performance level, which has generally been set by the local network organizations at the 10th-15th percentile of technician performance in each bucket.  *Id.*

Even if technicians fall short of the "Needs Improvement" level, however, they are not automatically subject to discipline, much less rigidly moved through disciplinary steps towards termination.  *See* Peirce Sec. Supp. Aff., ¶ 18; Lester Supp. Aff., ¶ 12.  As noted *supra*, supervisors and managers have discretion to grant exceptions to the QJD metric if a technician's circumstances warrant them.  *See* Peirce Sec. Supp. Aff., ¶¶ 9, 18; Lester Supp. Aff., ¶ 12.  Further, the preliminary consequences for an underperforming technician typically are not disciplinary.  *See* Peirce Sec. Supp. Aff., ¶ 18; Lester Supp. Aff., ¶ 13.  Even if a technician's performance remains poor, supervisors and managers have the ability to "reiterate" non-disciplinary steps, rather than move technicians into the formal disciplinary process.  *See*, *e.g.*, Peirce Sec. Supp. Aff., ¶ 18 & Ex. D.  Even once a technician is on formal disciplinary steps for QJD performance, supervisors and

-14-

managers may "reiterate" each step (*i.e.*, "Written Warning" or "Warning of Dismissal") rather than automatically progressing to the next step.  *See*, *e.g.*, Peirce Sec. Supp. Aff., ¶ 18 & Exs. E-F.  Thus, while the *fastest* that a technician could possibly be subject to termination for poor QJD performance has been 9 months (originally) or 6 months (currently) after their initial instance of poor performance, *see* Peirce Sec. Supp. Aff., ¶ 18, as a practical matter technicians are given much more time to improve their performance, based on the multiple tools provided under the PEP, before actually being subject to termination.  *Id.*  This is reflected in the minimal number of Minnesota technicians – only 35 from 2004-2010 – who have been terminated solely for poor QJD performance.  *See* Buchholz Aff., ¶ 27; Lester Supp. Aff., ¶ 16; Moreno Aff., ¶ 3.

Nor was Qwest unresponsive to opportunities to improve QJD.  Several changes were implemented to further improve its utility for technicians.  As noted, after the initial roll out, metrics were calculated at the director level of each state organization to permit even more accurate target setting, based on factors unique to each director group (*i.e.*, quality of plant, technician turnover, prior group improvements, etc.).  *See* Peirce Sec. Supp. Aff., ¶ 19.  Qwest also revised its feedback process.  For example, QJD performance was initially measured on a 3-month rolling basis, but was later analyzed on a monthly basis to ensure more timely feedback to technicians.  *Id.*  The scope of "repeats" also was narrowed to eliminate repeats not clearly attributable to poor workmanship by the technician.  *Id.*

### 5.   QJD was designed, and its targets set, appropriately and fairly.

In light of these facts, it is indisputable that Qwest's QJD performance

management system was appropriately and fairly designed.  More to the point, there is no available evidence that its targets have been set so irrationally as to support a reasonable inference of forcing off-the-clock work.   Dr. Kevin Murphy, an expert in work measurement systems, opines that Qwest's QJD metric is consistent with well-accepted principles for fair and effective performance measurement, including the use of objective measurements, when possible; articulation of clear performance expectations; and provision of clear performance feedback to employees subject to the metric.  *See* Murphy Aff., ¶ 7.  Dr. Murphy further opines, based on his examination of the evidence, that Qwest's QJD metrics are reasonable and achievable.  *See id.*, ¶ 8.  Indeed, in light of the fact that:

(1)  the "satisfactory" performance targets are "routinely defined at or near the level of performance most typically achieved by" technicians;

(2)  technicians must perform at an extremely low level (below the 10th-15th percentile of comparable technicians working in the same bucket) over an extended period before being subject to discipline;

(3)  initial efforts to improve technician performance are not disciplinary;

(4)  technicians are only realistically subject to discipline if they consistently fail to improve their performance notwithstanding individualized feedback, training, and assistance; and

(5)  Qwest policies unambiguously prohibit off-the-clock work and Qwest has paid extensive amounts of overtime,

Dr. Murphy finds no substantial evidence to suggest that Qwest's QJD metric would force technicians to work off-the-clock or that Qwest management had reason to know that its reasonable performance metrics, carefully designed to meet clearly important business needs, would have such an effect.  *See id.* , ¶¶ 10-12.

Based on decades of experience in the telecommunications industry, expert John Berringer similarly concludes not only that Qwest's QJD metric is necessary and appropriately designed in light of the competitive realities faced by Qwest in the telecommunication industry, *see* Berringer Aff., ¶¶ 7-8, but also that the particular QJD targets were set at realistic levels, *see id.*, ¶¶ 10-11.  Based on Berringer's extensive industry experience, there is nothing about how QJD was developed, modified, or implemented, or in the various QJD targets themselves, that would compel technicians to not report all of their work time accurately.  *Id.*, ¶ 15.  Nor is there any evidence that Qwest's implementation of a reasonably designed system, crafted consistent with industry norms and utilizing performance targets based on actual past achievements of the measured technicians, placed Qwest management on notice that those same technicians would compromise their personal integrity and violate well-established and well-known conduct expectations by falsely reporting their work time, much less on a class-wide basis.  *Id.*  Notably, Plaintiffs have no evidence or expert opinion to dispute these conclusions of Dr. Murphy or Mr. Berringer.

### F. Qwest's "out of garage rule" imposes no significant burden on technicians.

In addition to QJD, the other Qwest "policy" mentioned by the Court in its June 4 Order was Qwest's "out of garage rule."  For several years, as an additional means to improve technician efficiency and meet time-sensitive customer and regulatory demands, Qwest has asked that technicians start their routes within a certain amount of time after the beginning of their shifts.  *See* Lester Supp. Aff., ¶ 18.  These expectations have

ranged from 15-30 minutes over time and for different groups of technicians; for example, the current expectation is 20 minutes, although Broadband technicians may be given more time. *See* Peirce Sec. Supp. Aff., ¶ 30; Lester Supp. Aff., ¶ 19. Qwest also collects data showing the frequency with which technicians miss their out-of-garage targets and generates reports showing this data. *See*, *e.g.*, Peirce Sec. Supp. Aff., ¶ 30. There is no dispute, however, that the "out-of-garage rule" is merely a tool to provide supervisors additional coaching opportunities for technicians. The "rule" is not a disciplinary policy, and technicians are not disciplined simply because they may exceed their out-of-garage expectations. *Id.; see also* Sullivan, J. Dep. at 21-22 ("Q. Now, have you ever been disciplined as a result of not getting out of the garage in a timely manner? A. Spoken to … verbally two different occasions. … And if they do speak with you, it would just be a casual: Try to watch it. Try to get a little faster."); Mick Aff., Appx. 44.

## IV.   ARGUMENT

### A.   The Rule 56 Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the moving party bears the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996). The court must view all evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *See id.* But once the moving party carries its initial burden, the nonmoving party must

demonstrate the existence of specific material facts that are in dispute. *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995). The nonmoving party cannot create a genuine dispute of fact by relying upon conclusory allegations, speculation, or general assertions, but must set forth specific facts in the record showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

Federal Rule of Civil Procedure 56(d) contemplates that the Court may establish that certain facts are not genuinely in dispute for purposes of remaining proceedings. Here, where the Court has identified issues of fact – did QJD force class-wide off-the-clock work and did Qwest know that QJD would have that effect – as dispositive with respect to ongoing collective treatment, a motion seeking partial summary judgment as to those issues is appropriate.

**B.    Plaintiffs have indicated that they do not intend to rely on the QJD theory identified by the Court.**

Notwithstanding the "QJD theory" upon which Plaintiffs obtained certification of this collective action and the Court's express directive that Phase II Stage I of this case address the two elements of that theory, Plaintiffs have indicated an intent to focus on arguments unrelated to those issues. For example, in recent discovery disputes before Magistrate Judge Mayeron, Plaintiffs stated that they needed to inspect Qwest's premises to make their case:

> Plaintiffs' requested inspections are most certainly relevant ….
> Plaintiffs contend that their supervisors knew or should have known
> that Plaintiffs were working off-the-clock. One way Plaintiffs will

> prove this claim is through direct observation by supervisors of
> Plaintiffs working before and after their shifts.

Mick Aff., Ex. 4 at 3.  Plaintiffs also insisted that they needed to videotape technicians'

computer screens as evidence that Plaintiffs were so heavily loaded with work that they

needed to work off the clock:

> Plaintiffs also intend to videotape Plaintiffs' computer screens at the
> garages.  This will allow the Court and trier of fact to better
> understand Plaintiffs' routes for each day as well as Qwest's
> expectations with regard to job performance for that day.

*Id.*  Plaintiffs also demanded production of reports prepared from technician job dispatch

and other data, *id.*, asserting that such reports would demonstrate off-the-clock work and,

for some supervisors or managers who saw such reports, knowledge of alleged unpaid

overtime.  Such evidence, apparently intended to demonstrate *other* alleged causes of

unpaid work, or to prove that some supervisors knew that some technicians had worked

off the clock, has nothing to do with the questions the Court has identified as dispositive

of this stage of the case; that is, whether *QJD* forced alleged class-wide unpaid overtime,

and whether Qwest knew that *QJD* forced class-wide unpaid overtime.  Indeed, if

Plaintiffs now intend to rely on such evidence, contrary to the Court's directive to address

the QJD theory, decertification would be appropriate for the reasons set forth in Qwest's

prior motion.

### C.   Plaintiffs have no specific, substantial evidence that QJD forced class-wide unpaid work.

In order to carry their burden to establish the elements of the QJD theory,

Plaintiffs must first demonstrate that Qwest's QJD metrics forced technicians to work

unpaid time, as a class.  They cannot do so.

>    **1.    Plaintiffs' burden to show that QJD forced unpaid work is necessarily heavy.**

Plaintiffs' burden to prove that QJD forced class-wide unpaid overtime must be based on an objective evaluation of the facts, and not the technicians' subjective state of mind.  The significance of the QJD theory as the lynchpin for Plaintiffs' collective action necessarily means that Plaintiffs cannot carry their burden with evidence other than that QJD targets, uniformly, were so impossibly high that *all* technicians were objectively compelled to work off the clock to satisfy their particular targets.  If (as Qwest contends) QJD objectives were not unattainable across-the-board, so that at least some[4] technicians had a reasonable choice, given their personal circumstances, about whether to work off the clock – that is, if some technicians did not have to work off the clock to satisfy their QJD targets – the QJD theory cannot hold Plaintiffs' claims together under the "similarly situated" standard.

---

[4]    Qwest contends that *all* technicians had a choice not to violate Qwest policy by falsifying their self-reported time records.  Plaintiffs' theory is fundamentally flawed because employers have an undisputed right to impose performance expectations, even difficult ones.   Such expectations can never compel, or legally justify, technicians to falsify their time, in any meaningful sense, because employees always have a real choice between honesty and dishonesty, particularly in circumstances where the employer undisputedly always pays for every second of time reported by such employees.  But if there are circumstances under which an argument could be made that an employer's legitimate performance expectations forced employees to lie about their work time (and, again, there are not), such an argument must necessarily be based on evidence that the employees were objectively compelled to work off the clock.   Any lesser showing would render *any* performance management system subject to FLSA claims, a result certainly not countenanced under the law.

**2.      Regardless of the standard, undisputed evidence conclusively shows that QJD did not force class-wide unpaid overtime.**

Even if a valid argument could be made that a performance management system could force employees – on a class-wide basis – to work overtime without reporting it (and there is none), Plaintiffs' admissions preclude such an argument here.   Many Plaintiffs claim that they chose to work off the clock before QJD was introduced.   *See* Jensen Dep. at 67 ("Q.   So you were working off the clock, or so you claim, before QJD was ever implemented?   A.   Correct."); Mick Aff., Appx. 45.   Several plaintiffs were not measured under QJD during the relevant period.   *See* Peirce Sec. Supp. Aff., ¶ 31.   Other technicians claim reasons for alleged off-the-clock work other than QJD.   *See* Lundell Dep. at 90-91 ("My goal every day is to go home at quitting day [sic].   No matter what it takes, 4:30 I want my buns walking out the door because I have a life outside this company."); Mick Aff., Appx. 46.   Because these Plaintiffs admit that their alleged off-the-clock work was not performed because of QJD – having allegedly performed such work for other reasons, and/or before QJD was even implemented – Plaintiffs cannot carry their burden to establish that class-wide off-the-clock work was forced by QJD, as a matter of law.

**3.      Undisputed evidence that QJD targets are achievable precludes class-wide proof that QJD forced off-the-clock work.**

Plaintiffs also cannot establish the first element of the QJD theory because no evidence is available that QJD targets have been set at levels that would compel technicians to work off the clock.   To the contrary, the indisputable evidence is that the targets were driven by technicians' own recent past achievements, based on careful

analyses of objective historic performance data which were duplicated to ensure accuracy, validated, tested and re-validated.  *See* Peirce Sec. Supp. Aff., ¶¶ 12-14.

Furthermore, the "satisfactory" targets in each bucket and director group have been consistently set at or about the 50th percentile of historic technician performance; that is, at the level at which an "average" technician generally performs.  *See* Peirce Sec. Supp. Aff., ¶¶ 14, 20; Lester Supp. Aff., ¶ 6.   More significantly, the "needs improvement" level – the level at which a technician *may* be subject to discipline – has been consistently set *below* the "satisfactory" target, typically at or about the 10th-15[th] percentile of historic technician performance, in order to avoid imposing an unwieldy and unfocused performance management burden on supervisors.  *See* Peirce Sec. Supp. Aff., ¶ 21; Lester Supp. Aff., ¶ 11.   Indeed, the evidence is undisputed that the majority of technicians regularly satisfy their particular "satisfactory" target.  *See* Peirce Sec. Supp. Aff., ¶ 20.  Of the minority of technicians who have performed below their "satisfactory" target, even fewer technicians have been subject to discipline, fewer have actually been disciplined, and even fewer have actually been terminated.  *See id.*, ¶ 21; Lester Supp. Aff., ¶ 16; Moreno Aff., ¶ 3.  If the QJD "satisfactory" target is designed to be achieved by an average technician, most technicians regularly meet or exceed the "satisfactory" target, and only a distinct minority are disciplined for QJD performance, Plaintiffs cannot demonstrate that QJD targets objectively compel class-wide unpaid work, as they must. All Plaintiffs can conclusorily claim is that their QJD targets were subjectively difficult for them to attain.  Such allegations cannot demonstrate that they were *forced* to work off the clock, much less uniformly, as the Court has required.  *See*, *e.g.*, *Perez v. Safety-*

*Kleen Sys., Inc.*, 253 F.R.D. 508, 515 (N.D. Cal. 2008) ("There is no authority for the proposition that an employer is liable for failing to provide meal breaks simply because an employee chooses to forego a meal break in order to complete his or her work, absent evidence of a specific employer policy or practice of discouraging breaks.").

Indeed, many Plaintiffs admit that their QJD expectations are, in fact, reasonable. *See* Sanders Dep. at 111 ("Q.  In fact, [QJD is] probably reasonable for somebody like you, right?  A.  Yes.  I would say it's reasonable."); Mick Aff., Appx. 48.  Many others refuse to identify their own view of an achievable QJD standard, precluding any argument, much less proof, that their own standards were somehow unrealistically high. *See* Mick Aff., Appx. 42.   On these facts, Plaintiffs cannot demonstrate that QJD expectations have forced technicians to violate company policy and falsify their time records, much less on a class wide basis.

### 4. The variability of QJD expectations precludes proof that technicians were uniformly compelled to work unpaid overtime.

Plaintiffs also cannot satisfy the first element of the QJD theory because the variability in Plaintiffs' QJD expectations across buckets, across director organizations, and across time precludes proof that QJD forced unpaid overtime on a class-wide basis. *See*, *e.g.*, Lopez Aff., ¶¶ 3-5; Lester Aff., ¶ 14; Buchholz Aff., ¶ 23; Weaver Aff., ¶¶ 12-13; Lester Supp. Aff., ¶ 4.  Plaintiffs do not dispute this variability.

By way of illustration only, and even assuming that Plaintiffs' basic theory of the case were tenable legally (it is not), evidence (if any) that Director Tim Buchholz's 2009 QJD "satisfactory" target for the Broadband bucket forced certain Plaintiffs to work off

the clock could not possibly be evidence that Director Krista Lester's 2005 QJD "satisfactory" target for the POTS bucket forced other Plaintiffs to work off the clock. In other words, because some technicians left Qwest in each year of the class period, and QJD targets changed over time, evidence applicable to the claims of some technicians will have no bearing whatsoever on the claims of others. Likewise, most technicians who worked under one director never worked under other directors, much less all of them, and technicians who received QJD scores in one bucket may never have received scores in others. Plaintiffs also agree that different technicians naturally differ in their speed and skills and, thus, their ability to satisfy QJD targets, meaning that whatever pressure Technician A might feel to work off the clock to satisfy his QJD targets would not necessarily be felt by Technician B (or C, D, E, etc.) *See* Meyer Dep. at 47-48 ("The difference between techs that I learned a long time ago was no two people work at the same pace."); Mick Aff., Appx. 49. Plaintiffs have no evidence whatsoever that the various targets applicable to different technicians uniformly forced technicians, everywhere and at all times, to work off the clock. To the contrary, many Plaintiffs reject (correctly) the assertion that their claims are representative of other technicians or that other technicians' claims are representative of them. *See* Englehardt Dep. at 115 ("Q. And the fact that the QJD was working one way or reasonably for another guy wouldn't have anything to do with you then, right? A. They're – all the circumstances are different."); Mick Aff., Appx. 50. On this record, Plaintiffs cannot establish the first element of the QJD theory as a matter of law.

**D.** **Plaintiffs have no substantial evidence that Qwest knew or should have known that QJD allegedly forced off-the-clock work.**

In order to carry their burden to prove the QJD theory, Plaintiffs must also demonstrate that Qwest management knew or should have known that its various QJD targets (different for each director group and work bucket, and over time) uniformly forced technicians, as a class, to work without accurately reporting their time. In the class context, such a showing requires more than individualized anecdotes suggesting reports of alleged unpaid work by some employees. *See*, *e.g.*, *Bailey v. County of Georgetown*, 94 F.3d 152, 157 (4th Cir. 1996) ("Isolated incidents [reporting that overtime was not recorded] were not sufficient to put [defendant] on notice that, over the three-year period in question, deputies routinely did not report all of the hours they worked."); *Pforr v. Food Lion*, 851 F.2d 106, 109 (4th Cir. 1988) ("It is not enough for a plaintiff to establish his employer's knowledge of a few incidents of off-the-clock work, and upon this claim of knowledge, submit a record of his three years of alleged off-the-clock work."). Plaintiffs must proffer specific, class-wide evidence that Qwest knew or should have known that QJD was uniformly compelling unpaid overtime. As described in Qwest's motion for summary judgment, however, Plaintiffs do not offer any specific anecdotes suggesting such knowledge by management; rather, they rely on generalized allegations. On this record, summary judgment should be granted.

**1.** **Plaintiffs have no substantial evidence that Qwest actually knew that QJD forced class-wide unpaid overtime.**

Plaintiffs have no substantial, specific evidence that Qwest knew that QJD compelled technicians, as a class, to work unpaid overtime. Plaintiffs have not identified

any statements by corporate executives that might suggest corporate ambitions for, encouragement of, or even knowing acquiescence to off-the-clock work.  There is no evidence that Qwest employed a clocking or other automated time-keeping system that failed to capture elements of compensable work, much less deliberately, or that the Company implemented any rule or policy that prevented technicians from reporting all of their compensable time.  Plaintiffs do not suggest that supervisors improperly deleted compensable time from time records, much less pursuant to a corporate directive.  Plaintiffs do not suggest an illicit attempt to improve Qwest's bottom line by forcing employees to work overtime without reporting it, and there is no evidence of a systemic practice to discipline technicians for reporting overtime.  Thus, Plaintiffs' collective claims must proceed, if at all, on a constructive knowledge theory.  *See*, *e.g.*, *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986).  But Plaintiffs also have no evidence that Qwest should have known about alleged class-wide unpaid overtime forced by QJD.

### 2.    Plaintiffs' QJD theory precludes proof of knowledge.

Plaintiffs' QJD theory is fundamentally incompatible with proof that Qwest knew or should have known that its various QJD targets were forcing class-wide unpaid overtime.  The core allegation underpinning Plaintiffs' QJD theory is that Plaintiffs deliberately hid the alleged unpaid work they are now claiming.  *See* Brennan Dep. at 254 ("Q.  So you have . . . intentionally falsified time that you've submitted to the company?  A.  Correct."); Brooks Dep. at 106 ("Q.  Did your supervisor ever know that you weren't reporting your time accurately?  A.  I don't think so, no."); Mick Aff., Appx. 23 & 24.  Indeed, that was the point:  Plaintiffs supposedly needed to make certain that Qwest

*didn't know* about their alleged off-the-clock time, or their schemes to improve their QJD scores would not work.  *See* Hermanson Dep. at 87 ("Q. Is it fair to say that your success in being able to make your QJD numbers look better depended on your supervisor not knowing that you were underreporting your time?  A. I think so.  Q. In other words, you needed to make sure your supervisor didn't know about the underreporting to make the plan to improve the appearance of your QJD numbers work?  A. Right."); Stevens Dep. at 34 ("Q.  15, 20 minutes you think you can get away with without your supervisor ever finding out?  A.  Right."); Mick Aff., Appx. 25.

Arguments like Plaintiffs' have been widely rejected by other courts, under various theories.  *See Davis*, 792 F.2d at 1278 (rejecting theory that employer "should have anticipated that employees would routinely falsify their time records in violation of established company policy"); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414-15 (9th Cir. 1981) ("An employer must have an opportunity to comply with the provisions of the FLSA…. [W]here the acts of an employee prevent an employer from acquiring knowledge … of alleged uncompensated overtime hours, the employer cannot be said to have suffered or permitted the employee to work."); *Seever v. Carrols Corp.*, 528 F.Supp.2d 159, 170 (W.D.N.Y. 2007) ("[P]laintiffs' time records were maintained and paid exactly as plaintiffs fashioned them, meaning that any inaccuracies in [employer's] records are solely due to the plaintiffs' deliberate failure to accurately report the time they worked."); *Robertson v. Board of County Comm'r*, 78 F.Supp.2d 1142, 1158 (D. Co. 1999) ("If an employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of alleged overtime work, the employer's failure

to credit that overtime is not a violation of the FLSA."); *Uhler v. Galesi Mgmt. Corp.,* 1999 WL 20949, at *6 (N.D. Tex. Jan. 8, 1999) ("[S]ince [employer] regularly paid [employee] for overtime that he included in [his] time records, [employer] was entitled to rely on the representations [employee] made on his time cards and was permitted to assume that [employee] was working no overtime."); *Gaylord v. Miami-Dade County*, 78 F.Supp.2d 1320, 1326 (S.D. Fla. 1999) ("[Employer] approved some 1,800 hours of overtime work by [employee].   It is again unclear why [employee] would follow appropriate procedures for reimbursement for some overtime assignments, but not others."); *Prince v. MND Hospitality, Inc.*, 2009 WL 2170042, at *7 (S.D. Tex. July 20, 2009) ("An employee cannot perform overtime work without the employer's knowledge or contrary to its instructions and then assert a right to be paid.  If 'the employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207.'"); *cf. McGlothan v. Walmart Stores, Inc.*, 2006 WL 1679592, at *2 (M.D. Fla. June 4, 2006) ("[T]he affirmative defense of estoppel is available in response to an FLSA claim where the employee affirmatively misleads the employer regarding the number of hours worked and the employer had no knowledge of the employee's actual hours."); *Blanc v. Safetouch, Inc.*, 2008 WL 4059786, at *2 (M.D. Fla. Aug. 27, 2008) ("The unclean hands defense allows courts to take into account a plaintiff's wrongdoing when analyzing remedies in a FLSA action.").   Likewise, Plaintiffs' assertion that Qwest should be held liable for knowingly suffering alleged unpaid work that Plaintiffs hid from the Company should be rejected here.

###### 3. Qwest had no reason to know about alleged class-wide unpaid overtime allegedly forced by QJD when Plaintiffs' union never filed grievances alleging that such unpaid work was occurring.

Qwest's network technicians are represented by the CWA.  The CWA regularly uses the well-established contractual grievance and arbitration process to dispute compensation and other issues for its members.  *See* Joga Decl., ¶¶ 3-4.  Indeed, the CWA files many grievances on behalf of Qwest's union employees every year.  *Id.*; *see also* Roberts Supp. Decl., ¶ 5-6.  But there is no dispute that during the class period (indeed, during the entire period during which QJD has been in effect), the CWA has never filed a grievance suggesting that any Minnesota technician has worked off the clock because of QJD, much less that Minnesota technicians have done so on a class-wide basis.  *See* Joga Decl., ¶ 5; *see also* Roberts Supp. Decl., ¶ 3.  Plaintiffs themselves have admitted that they never filed such grievances.  *See* Dietz Dep. at 123 ("Q.  Did you ever file a grievance through your union saying that you were being forced to underreport your work time?  A.  No."); Mick Aff., Appx. 26.  There is no basis to find that Qwest had actual or constructive knowledge of class-wide unpaid overtime, forced by QJD, under these circumstances.

###### 4. Other evidence disproves knowledge of class-wide unpaid work, much less unpaid work compelled by QJD.

Plaintiffs' arguments also are untenable in light of other undisputed evidence.  As set forth in Qwest's summary judgment brief, there is no dispute that Qwest's policies unequivocally prohibit off-the-clock work and falsification of time records.  Plaintiffs admit that there is no Qwest rule or policy that prevented them from reporting time

accurately, and further admit that their supervisors instructed them to report all of their work time accurately.  *See* Dietz Dep. at 49 ("Q.  Any discussions about whether you should enter all of your time accurately with your supervisors?  A.  I remember that, yes.  Q.  So your supervisors reiterated the instruction to you that you should report all your time accurately?  Is that what you're saying?  A.  Correct."); Mick Aff., Appx. 27.  Plaintiffs have no reasonable basis to assert that Qwest knew or should have known about alleged class-wide unpaid overtime, for any reason, under these circumstances.  *See*, *e.g.*, *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 2009 WL 2391400, at *8-9 (5th Cir. Aug. 4, 2009).

Further, there is no dispute that Plaintiffs are empowered to report their own compensable time on an honor system.  This fact also contradicts any argument suggesting actual or constructive knowledge of widespread off-the-clock work.  *See*, *e.g.*, *King v. CVS/Caremark Corp.*, 2008 U.S. Dist. LEXIS 108614, at *14 (S.D. Fla. Sept. 11, 2008); *Millington v. Morrow Cty Bd. of Comm'rs*, 2007 WL 2908817, at *9 (S.D. Ohio Oct. 4, 2007).

Qwest also has undisputedly paid for every minute of compensable time, including overtime, Plaintiffs reported.  Faced with similar situations, courts regularly reject claims that employers should have known about alleged unpaid overtime.  *See*, *e.g.*, *Whitaker v. Pac. Enter. Oil Co.*, 1992 WL 44729, at *1-2 (10th Cir. Mar. 9, 1992); *White v. Starbucks Corp.*, 497 F.Supp.2d 1080, 1085 (N.D. Cal. 2007); *Berger v. Cleveland Clinic Found.*, 2007 WL 2902907, at *13 (N.D. Ohio Sept. 29, 2007); *Bjornson v. Daido Metal U.S.A., Inc.*, 12 F.Supp.2d 837, 840 (N.D. Ill. 1998); *Wood v. Mid-America Mgmt. Corp.*, 2006

WL 2188706, at *3-4 (6th Cir. Aug. 1, 2006).

Indeed, many Plaintiffs admit that Qwest had no reason to know that QJD allegedly forced unpaid overtime. *See* Jensen Dep. at 134 ("Q.  Do you have any reason to believe that Qwest knew that some technicians might respond to the QJD targets by underreporting their time? … A.  I guess you have to ask them.  I have no idea."); Mick Aff., Appx. 51.  Thus, Plaintiffs also cannot establish the second element of the QJD theory as a matter of law.

> **E.     Plaintiffs have no evidence that the "out-of-garage rule" forced class-wide off-the-clock work, much less that Qwest should have known about it.**

If Plaintiffs attempt to argue that Qwest's "out of garage rule" is a "policy" upon which their claim that the Company suffered class-wide unpaid overtime is based, that argument should rejected as a matter of law.  It is undisputed that no Plaintiff has ever been disciplined simply because he took more than the recommended amount of time in the garage before starting his route, much less that such discipline is a class-wide phenomenon.  *See* Knapp Dep. at 117-18 ("Q.  But you've never been disciplined for that?  A.  No.  Q.  Do you know of any co-workers who have been disciplined for that? A.  No …."); Mick Aff., Appx. 52.  Certainly, supervisors exhorted technicians to comply with the out-of-garage rule as a means to improve their productivity, but Plaintiffs cannot reasonably claim that technicians were *forced* to work off the clock, in any meaningful sense, by a "rule" that never resulted in discipline.  *Cf. White*, 497 F.Supp.2d at 1086-87 (rejecting claim that defendant forced employees to skip breaks

because of alleged labor budget restrictions where budgets were frequently exceeded and managers were not reprimanded for exceeding budgets).  At a minimum, Qwest certainly had no reason to know that merely exhorting technicians to leave their respective garages in a timely manner would cause them to underreport their time on a class-wide basis.  *Cf. id.*  On this record, Qwest's out-of-garage rule also provides no basis for collective treatment under the "QJD theory."

## V.    CONCLUSION

The Qwest QJD productivity expectations to which Plaintiffs object were at all times fundamentally rooted in technicians' own recent past productivity, when assigned equally difficult jobs with the same degree of variability about which they now complain. Moreover, and even more fundamentally, the FLSA is not a vehicle for employees to question the fairness or reasonableness of their employer's business judgment as to its work expectations.  Plaintiffs' testimony merely to the effect that Qwest asked too much of them does not state a claim under the FLSA absent specific, substantial evidence that Qwest was unwilling to pay them if the demands of their job caused them to work overtime.  Because Plaintiffs have no such evidence, and, indeed, indisputable evidence is squarely to the contrary, their "QJD theory" must be dismissed.

Dated:  March 18, 2010

DORSEY & WHITNEY LLP

s/ Ryan E. Mick
     Robert R. Reinhart #90566
     Melissa Raphan #182795
     Ryan E. Mick #311960
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
reinhart.robert@dorsey.com
raphan.melissa@dorsey.com
mick.ryan@dorsey.com

ATTORNEYS FOR DEFENDANTS