# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Lyle Brennan, Christopher Richard, and Michael Lundell, on behalf of themselves and other individuals similarly situated,

        Plaintiffs,

v.

Qwest Communications International, Inc., Qwest Communications Corporation, and Qwest Corporation,

        Defendants.

Civil File No. 07-cv-02024 ADM/JSM

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

DORSEY & WHITNEY LLP
Robert R. Reinhart #90566
Melissa Raphan #182795
Ryan E. Mick #311960
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
reinhart.robert@dorsey.com
raphan.melissa@dorsey.com
mick.ryan@dorsey.com

ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

Page #

I.     INTRODUCTION ................................................................................... 1

II.    STATEMENT OF FACTS ...................................................................... 3

III.   ARGUMENT .......................................................................................... 3

    A.   The Summary Judgment Standard ............................................... 3

    B.   Defendants Qwest Communications International, Inc. and Qwest
         Communications Corporation are not proper party defendants. ................. 4

    C.   Plaintiffs cannot establish that Qwest suffered unpaid overtime as a matter
         of law. ...................................................................................................... 5

         1.   Plaintiffs have no specific, substantial evidence of unpaid overtime,
              individually or collectively. .............................................................. 5

              a.   Undisputed evidence precludes proof of off-the-clock work.  5

                    i.    Qwest unambiguously prohibits off-the-clock work. .. 5

                    ii.   Qwest trusts its network technicians to report their
                          paid time honestly. ...................................................... 6

                    iii.  Qwest specifically makes paid time available for the
                          work activities alleged as unpaid by Plaintiffs. ........... 7

                    iv.   Qwest pays for every minute of reported overtime. .... 7

              b.   Plaintiffs have no specific, substantial evidence of off-the-
                  clock work. .......................................................................... 9

              c.   The burden-shifting approach is inapplicable to this case.... 11

              2.   Plaintiffs cannot prove that Qwest management knew or should have
              known about alleged off-the-clock work. ........................................ 13

                a.   Qwest cannot be held liable for knowingly permitting alleged
                  unpaid work on these facts, as a matter of law. ................... 14

                b.   Plaintiffs' admissions further preclude proof that Qwest
                  suffered unpaid work. ......................................................... 19

3.      Qwest's "systems" provide no evidence of off-the-clock work, much less that Qwest's managers knew or should have known about alleged off-the-clock work. ........................................................... 21

D.      The Named Plaintiffs' state law claims fail as a matter of law. ................. 25

1.      The Named Plaintiffs' break claims fail because Qwest provides adequate break opportunities. ....................................................... 26

2.      The Named Plaintiffs' equitable claims fail because they have an adequate remedy at law. ............................................................... 27

IV.    CONCLUSION ................................................................................... 28

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................. 3

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946) ..........................................................5, 11, 12

*Baker v. Stuart Broad. Co.*,
  560 F.2d 389 (8th Cir. 1977) ................................................. 4

*Berger v. Cleveland Clinic Found.*,
  2007 WL 2902907 (N.D. Ohio Sept. 29, 2007) ...................... 16

*Bjornson v. Daido Metal U.S.A., Inc.*
  12 F.Supp.2d 837 (N.D. Ill. 1998) ......................................... 16

*Bongat v. Fairview Nursing Care Ctr., Inc.*,
  341 F.Supp.2d 181 (E.D.N.Y. 2004) ...................................... 27

*Brown v. Fred's, Inc.*,
  494 F.3d 736 (8th Cir. 2007) ................................................. 4

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................. 3

*Davis v. Food Lion*,
  792 F.2d 1274 (4th Cir. 1986) .............................................. 14

*Donovan v. U.S. Postal Serv.*,
  530 F. Supp. 872 (D.D.C. 1981) ............................................ 27

*Enter. Bank v. Magna Bank*,
  92 F.3d 743 (8th Cir. 1996) ................................................. 3

*Forrester v. Roth's I.G.A. Foodliner, Inc.*,
  646 F.2d 413 (9th Cir. 1981) ................................................ 18

*Gaylord v. Miami-Dade County*,
  78 F.Supp.2d 1320 (S.D. Fla. 1999) ....................................... 9

*Hearnsberger v. Gillespie*,
  435 F.2d 926 (8th Cir. 1970) ................................................ 12

*Hertz v. Woodbury County, Iowa*,
566 F.3d 775 (8th Cir. 2009) .................................................................5, 22, 25

*King v. CVS/Caremark Corp.*,
2008 U.S. Dist. LEXIS 108614 (S.D. Fla. Sept. 11, 2008)........................................ 15

*Krenik v. County of Le Sueur*,
47 F.3d 953 (8th Cir. 1995) ................................................................................. 3

*McManus v. Fleetwood Enter., Inc.*,
320 F.3d 545 (5th Cir. 2003) ................................................................................ 5

*Millington v. Morrow Cty Bd. of Comm'rs*,
2007 WL 2908817 (S.D. Ohio Oct. 4, 2007) ......................................................11, 15

*Newton v. City of Henderson*,
47 F.3d 746 (5th Cir. 1995) .................................................................................14, 22

*O'Brien v. Ed Donnelly Enters., Inc.*,
575 F.3d 567 (6th Cir. 2009) ............................................................................... 12

*Rios v. Jennie-O Turkey Store, Inc.*,
No. 27-CV-03-020489 (slop ops.) ......................................................................26, 27

*Sandoval v. Am. Bldg. Maint. Indus., Inc.*,
578 F.3d 787 (8th Cir. 2009) ................................................................................ 4

*Seever v. Carrols Corp.*,
528 F.Supp.2d 159 (W.D.N.Y. 2007) ................................................................. 9, 11

*ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*,
544 N.W.2d 302 (Minn. 1996) ............................................................................. 27

*Smith v. Sprague*,
143 F.2d 647 (8th Cir. 1944) ............................................................................... 27

*Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc.*,
493 N.W.2d 137 (Minn. Ct. App. 1992) ............................................................... 27

*Uhler v. Galesi Mgmt. Corp.*,
1999 WL 20949 (N.D. Tex. Jan. 8, 1999)................................................................ 9

*Von Friewalde v. Boeing Aerospace Operations, Inc.*,
2009 WL 2391400 (5th Cir. Aug. 4, 2009) ............................................................ 15

*Whitaker v. Pac. Enter. Oil Co.*,
   1992 WL 44729 (10th Cir. Mar. 9, 1992) ................................................. 16

*White v. Starbucks Corp.*,
   497 F.Supp.2d 1080 (N.D. Cal. 2007) ......................................... 16, 20, 26

*Wood v. Mid-America Mgmt. Corp.*
   2006 WL 2188706 (6th Cir. Aug. 1, 2006) ........................................ 17, 18

## STATUTES

29 U.S.C. § 207(a)(1) ............................................................................ 4

Minn. Stat. § 177.253 .......................................................................... 26

Minn. Stat. § 177.254 .......................................................................... 26

## I.   INTRODUCTION

Remarkably, Plaintiffs accuse Qwest of failing to pay them for overtime they never reported, when they had every opportunity and responsibility to report it, and when they did consistently report and receive full premium pay, at levels higher than the law requires, for enormous amounts of overtime.  They have no corroborating evidence that they did work overtime for which they were not paid.  Indeed, in many cases, they are unable even to provide their own answer as to how much unpaid overtime they supposedly worked, leaving that to their attorneys to estimate in ways Plaintiffs themselves often say they do not understand or with which they do not agree.

Plaintiffs' jobs require them to work alone in the field and enter the private homes and businesses of Qwest's customers.  In these circumstances, Qwest must trust its technicians to act responsibly and to be trustworthy.  Qwest empowers its technicians to act largely without supervision.  Likewise, it empowers them to report their hours of work each day, unconstrained by any artificial mechanized systems or procedural limitations.  Accordingly, based on the undisputed facts shown below, Qwest cannot be faulted for underpaying them.

Plaintiffs allege claims against Defendants (collectively, "Qwest") for alleged unpaid overtime under the Fair Labor Standards Act ("FLSA").  Notwithstanding extensive discovery, Plaintiffs do not have any specific, substantial evidence of the alleged widespread FLSA violations upon which their claims are premised.  Further, the consent plaintiffs, individually, have not only failed to provide specific evidence that Qwest violated the FLSA in their own circumstances, but they frequently admit that they

cannot establish one or more of the elements of their claims.  This motion addresses the Plaintiffs' fundamental inability to satisfy their respective burdens of proof, regardless of issues related to Plaintiffs' "QJD theory."

Plaintiffs' claims fail because they cannot establish either element of their burden of proof.  First, they cannot establish the fact and extent of alleged unpaid time.  Faced with the undisputed facts that (1) Qwest's policies unambiguously require accurate time reporting, (2) technicians understand that their supervisors trust them to honestly report their time, (3) Qwest pays technicians for every minute of reported time, and (4) Plaintiffs themselves have been paid for tens of thousands of hours of overtime during the relevant period, Plaintiffs offer no specific, substantial evidence of unpaid overtime, much less the amount, either individually or collectively.  They have no records of alleged unpaid overtime and many Plaintiffs are unable even to allege specific instances of unpaid work.  Indeed, many Plaintiffs admit that trying to identify instances of alleged unpaid overtime would be impossible.  Instead, they offer bald allegations, which are insufficient to survive summary judgment.

Plaintiffs also cannot demonstrate that Qwest suffered alleged unpaid overtime. Faced with similar facts, courts routinely reject claims like Plaintiffs', premised on vague recollections of alleged unpaid work that plaintiffs never reported, when employers undisputedly paid for significant amounts of reported overtime.  Likewise here, Qwest justifiably relied on Plaintiffs to comply with the Company's unambiguous policies, and it paid for every minute of overtime Plaintiffs reported.  Faced with these undisputed, dispositive facts, Plaintiffs have no specific, substantial evidence that Qwest knew or

should have known of alleged unpaid work on any systemic basis, and many Plaintiffs admit the absence of such evidence as to themselves.  On this record, Plaintiffs' overtime claims should be dismissed.

## II.      STATEMENT OF FACTS

Qwest incorporates by reference the Statement of Facts set forth in Defendants' Memorandum of Law In Support of Rule 56(d) Motion as to the "QJD Theory."

## III.      ARGUMENT

### A.      The Summary Judgment Standard

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).  On a motion for summary judgment, the moving party bears the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996).  The court must view all evidence and draw all reasonable inferences in a light most favorable to the nonmoving party, *id.*, but once the moving party carries its initial burden, the nonmoving party must demonstrate the existence of specific material facts that are in dispute.  *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995).  The nonmoving party cannot create a genuine dispute of fact by relying upon conclusory allegations, speculation, or general assertions, but must set forth specific facts in the record showing that there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**B.      Defendants Qwest Communications International, Inc. and Qwest Communications Corporation are not proper party defendants.**

Defendants Qwest Communications International, Inc. and Qwest Communications Corporation do not employ any of the Plaintiffs.  Employees may only seek relief under the FLSA against their employers.  *See* 29 U.S.C. § 207(a)(1) ("[N]o employer shall employ any of his employees … for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.").  Qwest Corporation performs all day-to-day human resources functions for the network technicians at issue in this case.  *See Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 795 (8th Cir. 2009) (applying the four-factor test for an "integrated enterprise" from *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 391 (8th Cir. 1977), and the "strong presumption that a parent company is not the employer of its subsidiary's employees" (quoting *Brown v. Fred's, Inc.*, 494 F.3d 736, 739 (8th Cir. 2007))); Joga Decl., ¶¶ 7-12.  All of the Plaintiffs in this case and their supervisors and managers are or were employed solely by Qwest Corporation; neither Qwest Communications International, Inc. (the parent of the parent of Qwest Corporation) nor Qwest Communications Corporation (the limited liability company whose sole member is the parent of Qwest Corporation) has ever had any employment relationship with any Plaintiffs.  Joga Decl., ¶¶ 11-12.  As such, Defendants Qwest Communications International, Inc. and Qwest Communications Corporation should be dismissed as defendants in this case.

**C.** **Plaintiffs cannot establish that Qwest suffered unpaid overtime as a matter of law.**

**1.** **Plaintiffs have no specific, substantial evidence of unpaid overtime, individually or collectively.**

In order to prevail on their FLSA claim for alleged unpaid overtime, Plaintiffs bear the burden to establish the fact and amount of alleged unpaid time. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) (plaintiff must "prove that he has in fact performed work for which he was improperly compensated and … produce sufficient evidence to show the amount and extent of that work"); *Hertz v. Woodbury County, Iowa*, 566 F.3d 775, 783 (8th Cir. 2009) ("[I]t is the plaintiff's burden to show (1) that the plaintiff has performed compensable work and (2) the number of hours for which the plaintiff has not been properly paid."). Regardless whether this case is styled as a collective action, each Plaintiff bears the same burden to establish this element of their claim, and if that they cannot do so, they should be dismissed. *Cf. McManus v. Fleetwood Enter., Inc.*, 320 F.3d 545, 549 (5th Cir. 2003) ("[P]rocedural devices may 'not be construed to enlarge or diminish any substantive rights or obligations of any parties to any civil action."). Here, the record is clear that Plaintiffs cannot satisfy this element of their claim.

**a.** **Undisputed evidence precludes proof of off-the-clock work.**

Plaintiffs do not dispute several fundamental facts antithetical to their allegations of widespread off-the-clock work.

**i.** **Qwest unambiguously prohibits off-the-clock work.**

Qwest's policies unequivocally prohibit off-the-clock work and require

-5-

technicians to report their compensable time accurately. *See* Coddington Aff., ¶¶ 8-9 &
Exs. A-D; Miles Aff., ¶¶ 5-7 & Exs. A-E.[1]   Network technicians are trained annually
regarding those expectations. *See*, *e.g.*, Christopherson Dep. at 59.  Plaintiffs admit that
there is no Qwest rule or policy that prevents them from reporting their time accurately.
*See* Brooks Dep. at 67 ("Q.  Is there any Qwest rule or policy that actually prevents
technicians from entering all of their time accurately?  A.  No."); Mick Aff., Appx. 1.[2]

> ### ii. Qwest trusts its network technicians to report their paid time honestly.

Because network technicians work independently, Qwest cannot effectively
monitor the accuracy of technicians' reported time.  Supervisors are inherently limited in
their ability to monitor technicians' activities in the garages before and after their shifts,
and particularly while technicians are working at various customer locations in the field.
*See* Vooge Dep. at 62-63 ("Q.  How frequent were those days where you would literally
from start to end have no contact with your supervisor?  A.  I would say very much more
the norm."); Kirby Dep. at 27 ("Q.  How frequently does your supervisor oversee your
work in the field?  A.  Never."); Mick Aff., Appx. 2-5.

Further, technicians undisputedly are empowered to personally enter their total
work time at the end of each shift, essentially filling in the numbers themselves on their

---

[1]   Citations to depositions and affidavits from earlier briefs are included here for ease of
reference.  Deposition excerpts are set forth as exhibits to the Mick Affidavit.

[2]   In the interests of judicial efficiency and economy, Qwest brings its motion for
summary judgment as a consolidated motion seeking dismissal of all consent
plaintiffs, rather than filing motions against all consent plaintiffs individually, as it
would be entitled to do.  Admissions demonstrating the failure of individual plaintiffs'
claims are set forth in the designated appendices to the Mick Affidavit.

own paychecks.  *See, e.g.,* Kanada Dep. at 46.  Plaintiffs readily admit that Qwest trusts

them to enter their own work time accurately, the same way Qwest trusts them to act

safely and honestly as they interact with members of the public and in customers' homes

and businesses.  *See*, *e.g.*, *id.* at 53-54 ("Q.  So was there any way for your supervisor to

know exactly how much time you were working during a given day?  ….  A.  [T]he only

way they would know exactly what you were doing out there [is] if they actually come

out to see you.  I mean they assume that you're out there working …."); Laiti Dep. at 65

("Q.  Is it fair to say your supervisors trust you to be accurate in the time you report?  A.

Yes."); *see also* Mick Aff., Appx. 6-7.

### iii.  Qwest specifically makes paid time available for the work activities alleged as unpaid by Plaintiffs.

Network technicians have been given at least 15-30 minutes of paid time at the

beginning of their shift, and at least 15-20 minutes of paid time at the end of their shift,

during which they can complete tasks such as reviewing their daily routes, stocking their

work trucks, calling customers to arrange for appointments, and completing paperwork.

*See* Mick Aff., Appx. 8.  Technicians may also complete most of these tasks after leaving

the garage.  *See* Mick Aff., Appx. 9.  Many technicians acknowledge that they have no

claim for unpaid work related to those activities.  *See, e.g.*, Berken Dep. at 78 ("I've

never started prior to the start of my shift.  …  I didn't do anything after logging out

either."); *see also* Mick Aff., Appx. 10.

### iv.  Qwest pays for every minute of reported overtime.

Far from condoning unpaid work, Qwest often *requires* network technicians to

work overtime to meet customer commitments and pays for that overtime at or above the premium required by the FLSA.[3]  *See* Coddington Aff., Ex. E.  Qwest also provides Plaintiffs with the opportunity to take up to one hour of "incidental" overtime per day, generally without prior supervisor authorization, to finish their daily work.  *See* Lester Supp. Aff., ¶ 14.  Plaintiffs also can request additional overtime, as necessary, to ensure they are properly paid for their work, including "voluntary" overtime.  *Id.*, ¶ 15. Regardless of how it is characterized, Plaintiffs have the ability to self-report overtime, as necessary, to ensure they are paid for all of their work, *id.*, and Qwest pays for all overtime hours self-reported by network technicians.  *Id.*, ¶ 17; Byers Dep. at 29 ("Q. When you decided not to log these extra [pre-shift] minutes like you just explained, was that something you chose to do?  A.  I would have to say yes."); Mick Aff., Appx. 14. During the period at issue in this case, Plaintiffs have self-reported and been paid for more than 137,000 hours of overtime, totaling more than $5.9 million in total overtime compensation.  *See* Newsome Aff., ¶¶ 4-5, Ex. A.  Indeed, many Plaintiffs, individually, have reported more than 1,000 hours of overtime and have been paid tens of thousands of dollars in overtime compensation – including, for example, "representative plaintiff" Joel Briggs, who reported and was paid for 2835 hours of overtime.  *Id.*

---

[3]   Pursuant to its collective bargaining agreement with the Communications Workers of America ("CWA"), Qwest pays an overtime premium for all work reported in excess of 8 hours per day, and double time for work reported in excess of 49 hours per week, as well as automatic double time for Sunday work.  *See* Coddington Aff., Ex. E.

       **b.**      **Plaintiffs have no specific, substantial evidence of off-the-clock work.**

Under these circumstances, Plaintiffs should be strictly held to their burden to establish the fact and extent of alleged unpaid overtime: Having previously self-reported their own payroll time to Qwest, in the face of company policies that require accurate time reporting, a shared understanding among technicians that their supervisors trust them to honestly report their time, an undisputed company practice to pay for every minute of reported time, and the undisputed fact that Qwest paid Plaintiffs for tens of thousands of hours of overtime already, Plaintiffs must present specific, substantial evidence demonstrating that they actually worked additional time that they did not report. *Cf. Seever v. Carrols Corp.*, 528 F.Supp.2d 159, 170 (W.D.N.Y. 2007) ("[P]laintiffs' time records were maintained and paid exactly as plaintiffs fashioned them, meaning that any inaccuracies in [employer's] records are solely due to the plaintiffs' deliberate failure to accurately report the time they worked."); *Uhler v. Galesi Mgmt. Corp.*, 1999 WL 20949, at *6 (N.D. Tex. Jan. 8, 1999) ("[S]ince [employer] regularly paid [employee] for overtime that he included in [his] time records, [employer] was entitled to rely on the representations [employee] made on his time cards and was permitted to assume that [employee] was working no overtime."); *Gaylord v. Miami-Dade County*, 78 F.Supp.2d 1320, 1326 (S.D. Fla. 1999) ("[Employer] approved some 1,800 hours of overtime work by [employee]. It is again unclear why [employee] would follow appropriate procedures for reimbursement for some overtime assignments, but not others.").

Yet Plaintiffs have no specific evidence corroborating their otherwise bald

assertions that they worked off the clock, much less of a particular number of hours of unpaid overtime.  Plaintiffs identify no element of Qwest's timekeeping system that failed to capture any elements of compensable work, hardly surprising since Plaintiffs self-reported their own payroll time.  Most Plaintiffs have admitted that they have no records showing alleged unpaid work, even for the time period during which this lawsuit has been pending.  *See* Mick Aff., Appx. 15.  Plaintiffs cannot identify instances of alleged off-the-clock work, much less provide specific evidence supporting their claims of alleged unpaid work in those instances.  *See*, *e.g.*, Stevens Dep. at 67 ("Q.  And you don't have any specific memory of any particular dates that you worked off the clock?  A.   No."); Mick Aff., Appx. 16.   Indeed, many Plaintiffs admit that it would be impossible for them to go back and identify instances of off-the-clock work, much less for Qwest (or a jury) to determine instances of alleged unpaid overtime now.  *See* Brooks Dep. at 70 ("Q.  If I wanted to go back and determine on which days you underreported your work time for the day, how would I do that?  A.  I don't know.  I can't even recall."); Mick Aff., Appx. 17.   While none of the Plaintiffs have demonstrated a substantial factual basis for their claims of unpaid overtime, summary judgment is particularly appropriate for these Plaintiffs.

Instead of demonstrating specific material facts in support of their claims of unpaid overtime, Plaintiffs merely allege the amount of time they claim to have worked off-the-clock.  *Compare*, *e.g.*, Kanada Response to Interrogatory 8(a)-(b) ("Plaintiff does not recall the exact incidents of off-the-clock work because it was a regular occurrence; Plaintiff further states that he performed approximately 15-20 minutes of unpaid work

each day of his employment"); *with* Kanada Dep. at 47-48 ("Q. What's your best estimate of how many times you may have underreported y our paid time? A. For four years? I don't know, I'd say approximately maybe about 25 times."); Mick Aff., Appx. 18. Such conclusory allegations are insufficient to establish Plaintiffs' preliminary burden under *Mt. Clemens* as a matter of law. *See*, *e.g.*, *Millington v. Morrow Cty Bd. of Comm'rs*, 2007 WL 2908817, at *7 (S.D. Ohio Oct. 4, 2007) ("Plaintiff's bare allegation that he worked an average of five hours every week at home [was] insufficient to meet his burden of proof"). That is certainly true here where, when cross-examined, Plaintiffs widely admitted that their conclusory allegations were inaccurate, if not the result of outright guesswork. *See*, *e.g.*, Koziol Dep. (Feb. 17, 2010) at 85 ("Q. You can't tell me which days in December of 2009 you actually worked off the clock, right? A. No. Q. That's purely an estimate or a guess if you will, right? A. Yeah."); Mick Aff., Appx. 19.

> c.      **The burden-shifting approach is inapplicable to this case.**

Plaintiffs are likely to argue that their failure to identify specific evidence of alleged off-the-clock work is not fatal to their claims because the *Mt. Clemens* burden shifting approach to damages should apply in this case. That argument should be rejected.

A burden-shifting argument would be untenable because Plaintiffs must demonstrate, as a necessary prerequisite to shift any burden to Qwest, that Qwest failed to maintain adequate timekeeping records. *See Mt. Clemens*, 328 U.S. at 687. Here, there is no plausible argument that Qwest failed to keep adequate records: Qwest maintained its timekeeping records exactly as prepared and submitted by Plaintiffs. *See*, *e.g.*, *Seever*,

528 F.Supp.2d at 170 ("[P]laintiffs' time records were maintained and paid exactly as plaintiffs fashioned them, meaning that any inaccuracies in [employer's] records are solely due to the plaintiffs' deliberate failure to accurately report the time they worked.").

A burden-shifting argument also would fail because it only applies to an analysis of *damages* for uncompensated work, not liability.  Plaintiffs always bear the burden to establish liability by producing specific evidence of the fact of unpaid work.  *See Mt. Clemens*, 328 U.S. at 687.  Only after the plaintiff satisfies his burden to prove liability and his preliminary burden to establish a "just and reasonable inference" of damages does the burden shift to the employer to come forward with evidence to negate the employee's evidence of damages.  *See O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 603 (6th Cir. 2009) ("*Mt. Clemens Pottery* does not help plaintiffs show that there was a violation under the FLSA.  It would only allow them to prove damages by way of estimate, if they had already established liability."); *Hearnsberger v. Gillespie*, 435 F.2d 926, 932 (8th Cir. 1970) ("[B]efore the burden would shift to defendants … the plaintiff had the burden of 'producing evidence to show the amount of that work as a matter of fact and reasonable inference.'").

Here, even if the burden-shifting approach were applicable (and it is not), summary judgment would be appropriate because Plaintiffs cannot carry their burdens to establish (1) liability, that is, the fact of unpaid work; and (2) an amount of damages "as a matter of just and reasonable inference."  *Mt. Clemens*, 328 U.S. at 687.  As noted, Plaintiffs have no specific evidence of the fact of alleged unpaid work, individually or collectively.  As to damages, although Plaintiffs purported to state monthly estimates of

unpaid work hours in response to the Court-ordered survey, it is clear that the numbers submitted were not fact-based estimates from the individual Plaintiffs, but rather were amounts manufactured by Plaintiffs' counsel. When cross-examined regarding the "estimates" reported on their surveys, many Plaintiffs admitted that they had no idea how the numbers had been calculated. *See* Blanchard Dep. at 101 ("Q. And you have no idea where that 8.4 number came from, do you? A. Correct."); Sanders Dep. at 126 ("Q. Do you know how that number was calculated? A. No."); Mick Aff., Appx. 20. Some had never seen the "estimates" submitted on their behalf. *See* Meyer Dep. at 38 ("Q. When you signed on the back page [of the survey], had the chart been filled out? A. No."); Mick Aff., Appx. 21. Many Plaintiffs admitted that the "estimates" made for them contained major errors, such as alleged off-the-clock work claimed for months in which they did not work for Qwest. *See* Dietz Dep. at 148 ("Q. So for December through March or April of each one of these years [the numbers] should be zero? A. – should be zero, right."); Edgell Dep. at 49 ("A. So, yes, I guess it would be a safe assumption that it's probably not accurate."); Mick Aff., Appx. 22. On this record, Plaintiffs cannot carry their initial burden of proof to establish liability or damages, as a matter of law.

> **2.  Plaintiffs cannot prove that Qwest management knew or should have known about alleged off-the-clock work.**

Even if Plaintiffs (or some of them) could demonstrate the fact and extent of alleged unpaid overtime through specific record evidence (and they cannot), their claims still fail. In order for Plaintiffs to prevail on their claims for alleged unpaid overtime, it is not enough for them to demonstrate that they worked overtime hours for which they were

not compensated at an overtime rate. Plaintiffs also must demonstrate that Qwest "suffered or permitted" that unpaid work, that is, that Qwest management knew or should have known that Plaintiffs were engaged in uncompensated work. *See*, *e.g.*, *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986). Again, the record is clear that Plaintiffs cannot do so, much less prove that management knew about alleged widespread unpaid work, as Plaintiffs allege.

> **a.**   **Qwest cannot be held liable for knowingly permitting alleged unpaid work on these facts, as a matter of law.**

Undisputed record evidence conclusively demonstrates that Plaintiffs cannot satisfy the "suffer or permit" standard. As noted, there is no dispute that Qwest's policies unequivocally prohibit off-the-clock work and falsification of time records. Plaintiffs admit that there is no Qwest rule or policy that prevents them from reporting time accurately, and further admit that their supervisors instructed them to report their work time accurately. *See* Dietz Dep. at 49-50 ("Q.  Any discussions about whether you should enter all of your time accurately with your supervisors?  A.  I remember that, yes. Q.  So your supervisors reiterated the instruction to you that you should report all your time accurately?  Is that what you're saying?  A.  Correct."); Mick Aff., Appx. 27.  In similar circumstances, courts hold that employers are entitled to rely on employees to adhere to recognized company policies regarding the reporting of overtime work. *See*, *e.g.*, *Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995) (rejecting claim for alleged unpaid overtime where the defendant "established specific procedures to be followed in order to receive payment for overtime," and the plaintiff "ignored these

-14-

procedures"); *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 2009 WL 2391400,
at *8 (5th Cir. Aug. 4, 2009) ("[A]n employee has a duty to notify his employer when he
is working extra hours …. [W]e have expressly rejected the notion that an employer does
'not have the right to require an employee to adhere to its procedures for claiming
overtime.'").

Further, there is no dispute that Plaintiffs report their own payroll time to Qwest
and that Qwest trusts Plaintiffs to comply with its unambiguous policies by reporting
their time accurately. Regardless whether, as here, plaintiffs admit to a deliberate effort
to hide alleged unpaid time from their employer, courts widely reject claims for alleged
unpaid time when employees self-report their time on an honor system. *See*, *e.g.*, *Von
Friewalde*, 2009 WL 2391400, at *8 (rejecting claims arising from "days on which
[plaintiffs] failed to inform their managers that they had been forced to stay … late");
*King v. CVS/Caremark Corp.*, 2008 U.S. Dist. LEXIS 108614, at *14 (S.D. Fla. Sept. 11,
2008) ("Because it is undisputed that [employee] recorded his own time and admittedly
failed to report the alleged overtime on his time sheets or otherwise, [employee's] claims
… must fail."); *Millington*, 2007 WL 2908817, at *10 ("[I]t was reasonable for the
employer to rely on the time sheets submitted by the employee for payroll purposes
where there was no evidence that the employer encouraged workers to falsely report their
hours.").

Perhaps most significantly, there is no dispute that Plaintiffs were paid for every
minute of compensable time, including overtime, they reported. Faced with similar
situations, courts regularly reject claims premised on allegations that employers should

have known of unpaid overtime even though they paid for all overtime the claimants reported. *See, e.g., Whitaker v. Pac. Enter. Oil Co.*, 1992 WL 44729, at *2 (10th Cir. Mar. 9, 1992) ("[Plaintiff] presented conclusory [allegations] that his supervisors saw him working the alleged overtime. [Plaintiff] failed to offer any evidence to support these assertions or any evidence that [his supervisors] were untrustworthy. More importantly, [plaintiff] failed to offer any explanation how his supervisors during the relevant period knew or should have known that the overtime work he seeks compensation for in this case is different from the 279 hours of overtime which he was compensated for."); *White v. Starbucks Corp.*, 497 F.Supp.2d 1080, 1085 (N.D. Cal. 2007) ("Imputing constructive knowledge would be particularly inappropriate given that [plaintiff] was paid for significant overtime [and] was never criticized for working overtime."); *Berger v. Cleveland Clinic Found.*, 2007 WL 2902907, at *13 (N.D. Ohio Sept. 29, 2007) (rejecting claim for unpaid overtime where employee failed to record the time and employee admitted being paid for overtime on numerous occasions). For example, in *Bjornson v. Daido Metal U.S.A., Inc.*, the court faced similar claims for alleged unpaid overtime premised on the allegation that the employer created incentives for employees not to report their time. The court flatly rejected that claim:

> [Plaintiff's] alleged reluctance to submit overtime claims is flatly belied by his own demonstrated willingness and ability to do exactly that. [Plaintiff] submitted detailed and extensive requests for overtime. Those consistently-presented and always-honored claims … directly negate Bjornson's newly-claimed diffidence.
>
> As for the notion of some presumably hostile "corporate culture," [plaintiff] suffered no adverse job consequences as a result of his requests for overtime. Quite the reverse is true: [H]e [was] always

-16-

paid for the time that he requested [and] he admitted that he was never told that he had to perform uncompensated overtime.

12 F.Supp.2d 837, 840-41 (N.D. Ill. 1998).

Likewise, the Sixth Circuit's decision in *Wood v. Mid-America Mgmt. Corp.* is particularly instructive. There, as here, the plaintiff was paid for all of the overtime he submitted for payment, and the court rejected claims that the employer suffered additional unpaid overtime that the plaintiff did not report:

> [Plaintiff] was responsible for completing and signing his own time cards, which he submitted to the property manager for processing…. The parties agree that [defendant] always compensated [plaintiff] for overtime he reported…. Because [plaintiff] did report some overtime…, [defendant] had no reason to suspect that he neglected to report other overtime hours. [Plaintiff] does claim that he once told his supervisor that he was not reporting all of his overtime hours, but he also admits that in response she told him 'that [he] needed to report all of [his] overtime hours [and] that [he] couldn't get paid for them if they weren't written down, or reported…. At the end of the day, an employee must show that the employer knew or should have known that he was working overtime or, better yet, he should report the overtime hours himself. Either way, the employee bears some responsibility for the proper implementation of the FLSA's overtime provisions. An employer cannot satisfy an obligation that is has no reason to think exists. And an employee cannot undermine his employer's efforts to comply with the FLSA by consciously omitting overtime hours for which he knew he could be paid.

2006 WL 2188706, at *1, 3 (6th Cir. Aug. 1, 2006). As the Sixth Circuit properly recognized, even if an employee makes a general complaint that he has not reported some overtime, and particularly in a context where the employee is paid for the overtime he does report, an employer cannot be held to have suffered unpaid work where the plaintiff does not provide the employer sufficiently detailed information to ensure proper

payment.  *Id.*  Likewise, an argument that an employer should have been generally aware that it was creating pressures that might tempt some employees to work unpaid hours is not sufficient to satisfy the "suffer or permit" standard; again, plaintiffs must present specific evidence that their employer knew or should have known about unpaid work in a manner that would have allowed the employer to comply with its FLSA obligations.  *See*, *e.g.*, *Wood*, 2006 WL 2188706, at *3; *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981).

These authorities counsel in favor of summary judgment here.  Although some plaintiffs assert that they made occasional generalized complaints of alleged unpaid work to their particular supervisors,[4] these plaintiffs admit that they never provided sufficient detail to their supervisors to permit the supervisors to investigate those claims, much less ensure proper payment.  *See* Diercks Dep. at 123-124 ("Q.  Did you explain any particular instances of off-the-clock work to Mr. Kolterman?  A.  No …  Q.  Did you explain … the number of minutes … you thought people were working off the clock?  A. No.  Q.  Did you give … any indication of particular dates or instances in which you had worked off the clock?  A.  No.  Q.  Did you tell him how much you were working off the clock?  A.  No.  ***  Q.  Did you give him any facts that he could look into?  A.  No, I

---

[4]  Even among the minority of plaintiffs who alleged that they complained to their supervisors, most alleged that they complained about being unable to take a break. These plaintiffs did not suggest to their supervisors that they were working off the clock in those instances.  *See*, *e.g.*, Diercks Dep. at 66:67 ("Q. Did you ever … inform your supervisor that you had been unable to take a break[?]  A. Yes … once or twice. ***  Q. Did you tell your supervisor that you hadn't entered payroll time for working through the break?  A.  No.").

did not."); Mick Aff., Appx. 28.  As in *Wood*, such conclusory allegations are insufficient to hold that Qwest suffered alleged unpaid work, much less widespread unpaid work. Indeed, it is even more apparent here that Qwest had no reason to know of alleged unpaid work where Plaintiffs not only reported and were paid for extensive amounts of overtime, but actually reported and were paid overtime for the same activities on other days.  *See*, *e.g.*, Sabelko Dep. at 84 ("Q.  In effect, you will report the time that you worked through lunch as overtime?  A.  Yes, sometimes.  Not all the time.  It depends on when it is and how it falls ….  There is no exact science behind it."); Morse Dep. at 37 ("Q.  Have you ever claimed that 30-minuted lunch hour as overtime because you worked through it?  A. Yes, I have.  Q.  Okay.  How often do you do that?  A.  [O]nce a week, twice a week.  It all depends on how busy we are."); *cf.* Newsome Aff., Ex. A (showing 1341 and 1119 hours of overtime reported by Plaintiffs Sabelko and Morse, respectively, and paid by Qwest); *see also* Mick Aff., Appx. 29.

> **b.    Plaintiffs' admissions further preclude proof that Qwest suffered unpaid work.**

Plaintiffs' failure to offer specific evidence sufficient to satisfy the "suffer or permit" requirement of their FLSA claims is further apparent from the many admissions by Plaintiffs that they have no evidence that their supervisors, or Qwest management, knew about alleged unpaid work.  Of the 182 consent plaintiffs remaining in this case:

- 57 plaintiffs admit that they cannot identify any member of Qwest management who they believe suffered or permitted alleged unpaid work. *See* Mick Aff., Appx. 30-31.

- 115 plaintiffs admit that they never complained to Qwest management about alleged unpaid work.  *See* Mick Aff., Appx. 32-34.

-19-

- 123 plaintiffs admit that their managers never made any statements endorsing or instructing technicians to work off-the-clock. *See* Mick Aff., Appx. 35-36.

- 100 plaintiffs admit that they can identify no statements from Qwest management suggesting knowledge of alleged unpaid work. *See* Mick Aff., Appx. 37-38.

Because these plaintiffs admit that they have no factual basis for their claim that Qwest suffered their alleged unpaid work, their claims should be dismissed. *See*, *e.g.*, *White*, 497 F.Supp.2d at 1084 ("While plaintiff may be able to show a material dispute about whether [defendant] had actual or constructive knowledge that [some employees] sometimes worked off the clock, plaintiff has not submitted evidence that [defendant] had actual or constructive knowledge that [he] worked off the clock."); *cf. McManus*, 320 F.3d at 549.

In addition to basic admissions that the plaintiffs cannot carry their respective burdens to prove that Qwest suffered alleged unpaid work, many plaintiffs also admit that they performed their alleged unpaid work when Qwest supervisors and managers were not present and, thus, necessarily trusted the plaintiffs to report their payroll time accurately. *See* Kloos Dep. at 56 ("Q. Is there any way for your supervisor to know if you just skipped your break? A. No."); Mick Aff., Appx. 39. Again, given the undisputed facts that Qwest's policies unequivocally prohibit off-the-clock work, Qwest supervisors and managers regularly instructed technicians to report their time accurately, and Qwest paid plaintiffs for all overtime they did report, these admissions also should preclude these plaintiffs from carrying their burden to satisfy the "suffer or permit" requirement, as a matter of law.

-20-

>   **3.    Qwest's "systems" provide no evidence of off-the-clock work, much less that Qwest's managers knew or should have known about alleged off-the-clock work.**

Faced with an untenable QJD theory, undisputedly proper policies and practices, the absence of specific evidence of unpaid work from Plaintiffs themselves, and admissions from individual Plaintiffs that Qwest management did not know and had no reason to know about alleged off-the-clock work, Plaintiffs are likely to argue in opposition to summary judgment that Qwest has various operations systems that maintain data allegedly showing that Plaintiffs worked off the clock, and that Qwest management knew or should have known about alleged unpaid overtime based on that data. These arguments are meritless.[5]

Several fundamental facts preclude Plaintiffs' assertions. First, the systems identified by Plaintiffs are not designed to monitor payroll time. They are operations systems designed to permit more effective technician routing and to facilitate increased coaching opportunities for managers and supervisors. *See* Peirce Sec. Supp. Aff., ¶¶ 22-23; Larkin Decl., ¶ 3. Qwest has no obligation to attempt to use such systems, designed for different purposes, to ferret out possible instances of alleged unpaid work, particularly where, as here, such investigations would necessarily demand hours per day from each supervisor in order to obtain information that is not obvious evidence of unpaid work.

---

[5]   As noted in Qwest's accompanying Rule 56(d) motion, the fact that Qwest maintains certain data regarding technicians' activities has no bearing on whether Plaintiffs can establish the elements required by the Court in Phase II, Stage I of this case, that QJD forced technicians, as a class, to work off-the-clock, or that Qwest should have known that QJD forced class-wide off the clock work.

*See*, *e.g.*, *Hertz*, 566 F.3d at 782 ("The FLSA's standard for constructive knowledge in the overtime context is whether [defendant] 'should have known,' not whether it could have known.  It would not be reasonable to require that [defendant] to weed through non-payroll [records] to determine whether or not its employees were working beyond their scheduled hours.   This is particularly true given the fact that [defendant] has an established procedure for overtime claims that Plaintiffs regularly used."); *Newton*, 47 F.3d at 749 ("If we were to hold that the [Employer] had constructive knowledge that [Employee] was working overtime because [his supervisor] had the ability to investigate whether or not [Employee] was truthfully filling out the [Employer's] payroll forms, we would essentially be stating that the [Employer] did not have the right to require an employee to adhere to its procedures for claiming overtime.").

Second, it is undisputed that technicians enter their own total payroll time each work day.   This fact precludes Plaintiffs from asserting that certain data points demonstrate off-the-clock work because they fall before or after the Plaintiff's shift times.   In other words, the fact that a data point suggests that a Plaintiff logged on to a Qwest device or dispatched onto a job before his "shift start," for example, would not be evidence of off-the-clock work, much less evidence that the Plaintiff's supervisor knew about off-the-clock work, because the Plaintiff was not paid based on a "start time"; he was paid for the total number of hours and minutes he self-reported as his payroll time for that workday.[6]

---

[6]   Likewise, the fact that employees frequently work mandatory, voluntary, or incidental overtime, which requires or permits technicians to start before and/or work after their

Third, Qwest's data simply do not reflect total compensable work time.  For example, Plaintiffs may point to "WFA dispatch time," the amount of time that technicians self-report that they are dispatched onto jobs, as evidence of total work time, suggesting that if self-reported WFA dispatch time exceeds a Plaintiff's self-reported payroll time, unpaid work has been demonstrated.  There is no basis for that assertion.[7]  To the contrary, there are many reasons why WFA dispatch time can include non-work time.  *See* Peirce Sec. Supp. Aff., ¶ 24.  By way of a single example only, many technicians admit that they stayed in "dispatch" status in the WFA system while they took unpaid meal breaks.  *See* Briggs Dep. at 75 ("Q.  Do you typically dispatch off of the job on the days that you do take a lunch?  A. No, I usually stay on the one I'm on."); Engelhardt Dep. at 80 ("Q.  [Y]ou never dispatched off for a meal break?  A.  No."); Mick Aff., Appx. 40.

For the same reason, the absence of a 30-minute "gap" in the WFA dispatch system is not evidence that a technician worked through a meal break.  Because Plaintiffs admitted that they could – and did – stay "dispatched" on the WFA system even when they stopped to eat a meal, the fact that Qwest's dispatch data for a particular technician

---

normal shift times, renders any attempt to compare data points to shift times meaningless.

[7] It is not Qwest's argument that WFA dispatch time always exceeds, or should necessarily exceed, total work time.  For example, a technician could have more total work time than WFA dispatch time if she was in a work-related meeting or engaged in equipment maintenance that did not require her to dispatch onto a WFA job.  The point is simply that WFA dispatch time is not accurate evidence of a technician's total work time on any given day, as required for Plaintiffs to carry their burden to establish unpaid work.  *See* Peirce Sec. Supp. Aff., ¶¶ 26-29.

on a particular day does not show a 30 minute period where the Plaintiff was not dispatched on a job does not suggest the absence of a meal period.  *See* Peirce Sec. Supp. Aff., ¶ 25.

Indeed, Plaintiffs consistently admit that Qwest's data is *not* accurate evidence of alleged unpaid work, much less that such data should have put their supervisors on notice of alleged unpaid work, since neither Qwest's WFA data, nor its GPS data tells management whether technicians are actually working while they are dispatched on a particular job or while their truck is located at a particular address.  *See* Hermanson Dep. at 44-45 ("Q.  Did the WFA dispatch times … tell a supervisor what the technician was actually doing in the field at any particular time?  A. Only what job they were on."); Labarre Dep. at 63 ("A.  [GPS] just shows where your truck is at I guess.  I guess if they're not physically there, I guess [supervisors] don't know exactly what you're doing."); *see also* Peirce Sec. Supp. Aff., ¶¶ 23-25; Larkin Decl., ¶¶ 5-8; Mick Aff., Appx. 41.

Even if Qwest's data were evidence of technicians' total compensable work time (and it is not), Plaintiffs' reliance on that data as evidence that Qwest management suffered a widespread pattern of daily unpaid work, as Plaintiffs' allege, would fail because the data reported to Qwest management did not show such underpayment. Qwest management receives daily reports which, among other things, show a comparison of self-reported WFA dispatch time to self-reported payroll time for the prior day for the technicians in their respective organizations.  *See* Peirce Sec. Supp. Aff., ¶ 27.  Likewise, although there are no regular published reports, managers have the ability to access a

-24-

"Supervisor Analysis Tool" that permits a comparison of self-reported WFA dispatch time to self-reported payroll time for particular technicians.  *Id.*, ¶ 28.  As noted, these tools are not evidence that Qwest suffered unpaid time, as a matter of law, because Qwest has no obligation to investigate the mere possibility of unpaid overtime from data that was not designed for the purpose of payroll analysis.  *See Hertz*, 566 F.3d at 781-82.  In any event, here, far from showing the widespread pattern of "underpayment" alleged by Plaintiffs, Qwest's reports regularly show payroll time equal to or in excess of WFA dispatch time.  *See* Peirce Sec. Supp. Aff., ¶ 27.  Even as to the 19 "representative plaintiffs," the data shows that for more than 75% of those technicians, their payroll time matched or exceeded their WFA dispatch time on the vast majority of days.  *See id.*, ¶ 29. To be clear, this does not necessarily suggest that technicians in general, or the "representative plaintiffs" individually, were overpaid on given days, *id.*, but the fact that the data reasonably available to Qwest management so frequently demonstrated payroll hours equal to or in excess of reported WFA time precludes any reasonable argument that Qwest management knew or should have known of alleged unpaid work based on that data.

**D.    The Named Plaintiffs' state law claims fail as a matter of law.**

Unlike the consent plaintiffs, who have only asserted FLSA overtime claims against Qwest, *see* Mick Aff., Exs. 1-3, Named Plaintiffs Lyle Brennan, Michael Lundell, and Chris Richard also assert Minnesota state law claims against Qwest for alleged break violations and equitable claims.  These claims also fail as a matter of law.

### 1.   The Named Plaintiffs' break claims fail because Qwest provides adequate break opportunities.

Count III of Plaintiffs' Complaint seeks relief under Minnesota's meal and rest break statutes.  Minnesota's meal break statute provides that employers must permit employees "sufficient time to eat a meal."  Minn. Stat. § 177.254.  The rest break statute provides that employers must allow employees "adequate time" to utilize the restroom. Minn. Stat. § 177.253.  These statutes impose no bright-line requirement that employers provide a particular amount of time for meal or rest breaks; nor must an employer compel employees to take the breaks.  *See, e.g., Rios v. Jennie-O Turkey Store, Inc.*, No. 27-CV-03-020489, at *2-3 (Minn. Dist. Ct. Feb. 13, 2008) (slip op.); *cf. White*, 497 F.Supp.2d at 1088 (California statute requiring employers to "provide" meal breaks only requires employers to offer meal periods, not ensure those periods were actually taken). Employers' only obligation is to make available sufficient break opportunities, regardless whether employees choose to take advantage of those opportunities.  *Id.*

Qwest makes adequate meal and rest break opportunities available to technicians, and its policies unequivocally require technicians to take them.  *See* Coddington Aff., ¶ 9 & Exs. B-D.  The Named Plaintiffs testified that their supervisors have trusted them to take their breaks.  *See* Lundell Dep. at 141 (Lundell's supervisor would not know if he skips lunch); Brennan Dep. at 164-68 (Brennan's supervisor advised him to report instances where he missed a meal break, but Brennan does not do so); Richard Dep. at 244 (unless Richard informed him, his supervisor would not know if Richard skipped lunch).  Even if the Named Plaintiffs now claim that they chose not to take advantage of

the break opportunities Qwest provided and empowered them to take, that simply is not evidence that Qwest did not comply with the simple requirements of Minn. Stat. §§ 177.253 and 177.254.

### 2. The Named Plaintiffs' equitable claims fail because they have an adequate remedy at law.

Counts IV and V of Plaintiffs' Complaint seek equitable relief on the common law theories of unjust enrichment and *quantum meruit*, respectively. "It is well settled in Minnesota that one may not seek a remedy in equity when there is an adequate remedy at law." *Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992) (citations omitted). An adequate remedy at law simply means that there exists a legal cause of action for the alleged injury, for which the remedy sought by the claimant may be available in the event the claimant were able to prevail on his legal claim. *See ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996). A plaintiff's success, lack of success, or likelihood of success on a legal cause of action is irrelevant. *See id.*; *Smith v. Sprague*, 143 F.2d 647, 650 (8th Cir. 1944). Here, Plaintiffs' equitable claims fail because they have an adequate remedy at law: their claims for alleged lost wages are subject to the statutory framework of the FLSA. *See, e.g., Bongat v. Fairview Nursing Care Ctr., Inc.*, 341 F.Supp.2d 181, 189 (E.D.N.Y. 2004); *Donovan v. U.S. Postal Serv.*, 530 F. Supp. 872, 894 (D.D.C. 1981); *Rios v. Jennie-O Turkey Store, Inc.*, No. 27-CV-03-020489, at *8 (Minn. Dist. Ct. Sept. 7, 2007) (slip op.).

## IV.      CONCLUSION

More is needed to support claims of unpaid overtime than speculative, vague, purported recollections of uncompensated work unaccompanied by any legally cognizable justification for failure to report it as instructed.  Accordingly, and for the reasons set forth above, Qwest's motion for summary judgment should be granted and Plaintiffs' Complaint dismissed, with prejudice.

Dated:  March 18, 2010                    DORSEY & WHITNEY LLP

s/ Ryan E. Mick
   Robert R. Reinhart #90566
   Melissa Raphan #182795
   Ryan E. Mick #311960
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
reinhart.robert@dorsey.com
raphan.melissa@dorsey.com
mick.ryan@dorsey.com

ATTORNEYS FOR DEFENDANTS