# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Lyle Brennan, Christopher Richard,
and Michael Lundell, on behalf of
themselves and other individuals
similarly situated,

                Plaintiffs,

    v.

Qwest Communications International,
Inc., Qwest Communications Corporation,
and Qwest Corporation,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 07-2024 ADM/JSM

---

James H. Kaster, Esq., Paul J. Lukas, Esq., Sarah M. Fleegel, Esq., David E. Schlesinger, Esq.,
and Amy S. York, Esq., Nichols Kaster & Anderson, PLLP, Minneapolis, MN; and Paul
Egtvedt, Esq., Egtvedt Law Firm, PLC, Minneapolis, MN, on behalf of Plaintiffs.

Robert R. Reinhart, Esq., Melissa Raphan, Esq., and Ryan E. Mick, Esq., Dorsey & Whitney
LLP, Minneapolis, MN, on behalf of Defendants.

---

# I. INTRODUCTION

On April 29, 2010, the undersigned United States District Judge heard oral argument on

Defendants Qwest Communications International, Inc., Qwest Communications Corporation,

and Qwest Corporation's (collectively "Qwest") Rule 56(d) Motion [Docket No. 395] and

Motion for Summary Judgment [Docket No. 398].[1] Plaintiffs Lyle Brennan, Christopher

Richard, and Michael Lundell ("Plaintiffs") initiated this collective action asserting claims

---

[1] The Court joins in Magistrate Judge Janie S. Mayeron's disapproval of the tactic
employed by Qwest's counsel of simultaneously filing two summary judgment motions
collectively exceeding 12,000 words. See March 30, 2010 Letter [Docket No. 439]. The
complexity of the issues did warrant the increase in the word limit. Rather than filing two
motions, Qwest's counsel should have followed the practice prescribed by LR 7.1(d) by
requesting permission to enlarge the word limitation prior to submitting its opening briefs.

against Qwest for wage violations under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219, and the Minnesota Fair Labor Standards Act ("MFLSA"), Minn. Stat. §§ 177.21-.35. For the reasons set forth herein, Qwest's Rule 56(d) Motion is denied and Motion for Summary Judgment is granted in part and denied in part.

## II. BACKGROUND[2]

The Court granted conditional certification of Plaintiffs' claims on March 25, 2008 [Docket No. 108], and denied Qwest's motion for decertification on June 4, 2009 [Docket No. 339]. Because the factual background is set forth in the prior orders, only a summary of the facts relevant to the specific issues raised by the current motions will be repeated here.

Qwest is a telecommunications company operating a network of internet service, cellular telephone service, long-distance telephone service, and digital television service to business and residential customers. March 25, 2008 Order at 2, June 4, 2009 Order at 2. Plaintiffs are current and former network technicians employed by Qwest throughout Minnesota. Collective & Class Action Compl. ("Compl.") [Docket No. 1] ¶ 3. Plaintiffs' job responsibilities are driving Qwest trucks to customers' premises to install, maintain, repair, and test various aspects of Qwest's telecommunications network. June 4, 2009 Order at 2; Coddington Aff. [Docket No. 403] ¶ 3.

At the forefront of the parties' dispute is the Quality Jobs per Day ("QJD") metric, which is a "performance measurement component" Qwest created in 2003 and 2004 to "develop[] stronger technician performance and enhanc[e] relationships between technicians and management, in order to continuously improve productivity, quality and customer service."

---

[2] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

Peirce 2d Suppl. Aff. [Docket No. 412] ¶¶ 2-4; Berringer Aff. [Docket No. 414] ¶¶ 5, 8.  QJD

measures "real productivity" by determining a QJD score through the following formula: "(Job

Completions - 30 Day Repeats) / (Payroll Hours / 8 hours)."  Peirce 2d Suppl. Aff. ¶¶ 8, 11.

Because technicians perform different types of work, QJD scores are measured in four categories

or "buckets"—Plain Old Telephone Service or "POTS," Designed Services or "DS," Digital

Subscriber Line or "DSL," and Cable—with different expectations applicable to each category.

Id. ¶¶ 8, 12.  Expectations are "stratified" into five performance levels: "Outstanding,"

"Satisfactory," "Less than Satisfactory," "Needs Improvement," and "Unacceptable."[3]  Id. ¶ 18;

Defs.' Mem. in Supp. of Rule 56(d) Mot. [Docket No. 397] at 14.  Technicians whose QJD

scores fall in the "needs improvement" performance level may be subject to progressive levels of

discipline, from "Documented Discussion, to Written Warning, then Warning of Dismissal, and

finally becom[ing] subject to Dismissal."  June 4, 2009 Order at 4.

Plaintiffs' unpaid overtime claims also implicate Qwest's so-called "out-of-garage rule."

Technicians begin their work day at a Qwest garage and drive Qwest trucks to customers'

premises to perform their work.  June 4, 2009 Order at 2.  Before leaving the garage, technicians

must (1) review all assigned work and commitment times; (2) make sure the vehicle is clean,

stocked with necessary tools and equipment, and otherwise ready for the day; (3) call the first

customer and Qwest dispatch; and (4) perform certain pre-tests.  Id. at 2-3.  Technicians are

expected to complete these tasks and leave the garage for the first job within fifteen minutes of

_____

[3] The process by which Qwest determined the QJD scores applicable to each performance
level is explained in the Discussion section, see infra III.B.

the start time.  Id. at 3.  Also, upon returning to the garage at the end of the day, the technician

must complete time entries.  Id.

Plaintiffs allege that they have performed off-the-clock work to meet QJD expectations

and comply with the out-of-the garage rule.  Further, Plaintiffs allege that Qwest knew (or

should have known) that its policies and expectations were causing such off-the-clock work and

yet has failed to compensate them for that time worked.  Qwest denies the allegations and

stresses that (1) the QJD expectations were carefully developed to be objectively reasonable; (2)

its policies and practices prohibit, rather than cause, off-the-clock work; (3) technicians bear the

responsibility of self-reporting their time and doing so honestly and accurately; and (4) every

minute of overtime that technicians report is compensated.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion

for summary judgment, the Court views the evidence in the light most favorable to the

nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere

allegations or denials, but must demonstrate on the record the existence of specific facts which

create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     Qwest's Motion for Partial Summary Judgment Regarding QJD**

The FLSA requires employers to pay all covered employees at least one and a half times their regular rate of pay for hours worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1). An employer violates the FLSA by failing to compensate employees for overtime work if the employer suffered or permitted such work. See Chao v. Gotham Registry, Inc., 514 F.3d 280, 291 (2d Cir. 2008); Falcon v. Starbucks Corp., 580 F. Supp. 2d 528, 533 (S.D. Tex. 2008) ("An employer must compensate employees for all work it suffers or permits."). "'[T]he words "suffer" and "permit" as used in the statute mean "with the knowledge of the employer."'" Forrester v. Roth's I.G.A. Foodliner, Inc., 646 F.2d 413, 414 (9th Cir. 1981) (quoting Fox v. Summit King Mines, 143 F.2d 926 (9th Cir. 1944)) (alteration in original). Knowledge may be actual or constructive, and, thus, an employer is liable for its employees' unpaid overtime work if the employer "knew or should have known that they were working overtime." Hertz v. Woodbury County, Iowa, 566 F.3d 775, 781 (8th Cir. 2009); see also Newton v. City of Henderson, 47 F.3d 746, 748 (5th Cir. 1995). "[I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed," management "cannot sit back and accept the benefits without compensating for them," and "[t]he mere promulgation of a rule against such work is not enough" because "[m]anagement has the power to enforce the rule and must make every effort to do so." 29 C.F.R. § 785.13. By contrast, if an employer has no actual or constructive knowledge of overtime work and the employee fails to notify the employer or deliberately prevents the employer from learning of the overtime work, no violation has occurred. Forrester, 646 F.2d at 414.

5

By its first motion, Qwest seeks summary judgment that Plaintiffs' attempt to predicate FLSA claims on QJD expectations fails as a matter of law. Specifically, Qwest argues that no triable issues remain concerning whether (1) Plaintiffs performed off-the-clock work in order to comply with QJD standards and (2) Qwest knew or should have known that such off-the-clock work was occurring.

### 1.    Performance Standards and Off-the-clock Work

Qwest insists that, as a matter of law, employers cannot be held liable for unpaid overtime on a theory that performance or productivity standards such as QJD caused off-the-clock work. However, Qwest cites no authority, and the Court is aware of none, in support of such a proposition.[4] Qwest reasons that employers have an "undisputed right to impose performance expectations, even difficult ones," and an employee's choice to falsify his time records cannot be justified by claiming that the performance expectations forced him to do so. Defs.' Mem. in Supp. of Rule 56(d) Mot. at 21, n.4. Certainly, if an employer were to impose performance expectations at an unattainably high level such that it could be shown that the employer necessarily knew that employees could not meet the expectations without working off the clock, then the employer would have suffered or permitted such off-the-clock work if it failed to prevent it. See Chao, 514 F.3d 280, 290-91 (2d Cir. 2008).

---

[4] The only known case in which a similar issue was posed also involved Qwest. See Brechler v. Qwest Commc'ns Int'l, Inc., No. cv-06-940, 2009 WL 692329 (D. Ariz. Mar. 17, 2009). Brechler did not answer the inquiry "whether lawful performance standards can (and did) give rise to a violation of FLSA by de facto requiring overtime that is then uncompensated" presented a question of law for the court to resolve or a question of fact for the factfinder to resolve. Id. at *2.

Qwest retreats a step and now argues that even "if there are circumstances under which an argument could be made that an employer's legitimate performance expectations forced employees to lie about their work time . . ., such an argument must necessarily be based on evidence that the employees were objectively compelled to work off the clock." Defs.' Mem. in Supp. of Rule 56(d) Mot. at 21, n.4. Otherwise, Qwest concludes, "any performance management system [would be] subject to FLSA claims, a result certainly not countenanced under the law." Id. Plaintiffs do not contest that their claims can be viable only if QJD expectations are shown to be so unreasonable that they objectively compelled off-the-clock work. Thus, the parties have framed the issue for the Court as turning on whether there are fact issues regarding the reasonableness of the QJD standards.[5]

Assuming that Qwest can be held liable under the FLSA for off-the-clock work allegedly performed in order to meet QJD expectations only if those standards are shown to be objectively unreasonable, there are unresolved fact issues bearing on the objective reasonableness of the QJD expectations. Qwest contends the QJD expectations are demonstrably reasonable because

---

[5] Although the Court's analysis will track the issues as the parties have presented them in the factual context of this case, it is unclear whether the only situation in which off-the-clock work completed to meet performance standards could ever support FLSA liability is if the performance standards are shown to be objectively unreasonable. From a policy perspective, subjecting an employer to potential FLSA liability merely for imposing performance standards—especially, ones that are objectively reasonable—is ill advised. However, no rule of law precludes an FLSA claim from being based on a theory that off-the-clock work occurred, with the employer's actual or constructive knowledge, as a result of performance standards that are objectively reasonable. Instead, "[t]he reason an employee continues to work beyond his shift is immaterial; if the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted." Reich v. Dep't of Conservation & Natural Res., 28 F.3d 1076, 1082 (11th Cir. 1994) (citing 29 C.F.R. § 785.11); Allen v. Bd. of Pub. Educ. for Bibb County, 495 F.3d 1306, 1314 (11th Cir. 2007) ("It is not relevant that the employer did not ask the employee to do the work. The reason the employee performed the work is also not relevant.").

(1) QJD expectations were "driven by technicians' own recent past achievements, based on careful analyses of objective historic performance data [that] were duplicated to ensure accuracy, validated, tested, and re-validated"; (2) the "satisfactory" level in each of the four categories and each director group have been consistently set "at or about the 50th percentile of historic technician performance"; (3) the "needs improvement" level has consistently been set "at or about the 10th - 15th percentile"; (4) a majority of technicians regularly achieve satisfactory levels; and (5) of the few technicians who fall below the satisfactory level, even fewer have been disciplined. Defs.' Mem. in Supp. of Rule 56(d) Mot. at 23; Peirce 2d Suppl. Aff. ¶¶ 12-14. As the Court previously observed, evidence showing that performance expectations are objectively reasonable reflects on the credibility of testimony that work was done off the clock to meet performance expectations. See June 4, 2009 Order at 10 n.2 (explaining that evidence of the reasonableness of the QJD expectations might ultimately persuade a factfinder to reject, as lacking credibility, Plaintiffs' claim, supported by their own testimony and responses to the questionnaire, that the reason the technicians in this action worked off the clock was to comply with QJD expectations).

Plaintiffs have produced competing evidence of the reasonableness of the QJD standards. For example, Qwest's manager of process management, Roger Peirce, has stated that in the years 2005, 2006, 2007, and 2008, the percentage of technicians who "satisfied their minimum performance expectations on a monthly basis" was, on average, 80%, 54%, 63%, and 69%, respectively. Peirce Aff. [Docket No. 411] ¶ 2; Peirce Suppl. Aff. [Docket No. 426] ¶ 2. Plaintiffs have also identified evidence that (1) technicians were commonly assigned a daily work load that Qwest itself estimated would require as much as ten or eleven hours to complete

and (2) the failure to complete the work load would impact QJD scores negatively. Morgan Aff. [Docket Nos. 443-44], Ex. 70 (Sullivan Depo.) at 77-78, Ex. 72 (Tombers Depo.) at 74-76.

Qwest also argues that to establish their FLSA claims, Plaintiffs must show QJD expectations "uniformly" forced "*all* technicians" to work off the clock and that Qwest knew or should have known that QJD had such a uniform effect on all technicians. Defs.' Mem. in Supp. of Rule 56(d) Mot. at 21. Evidence that QJD did not uniformly force all technicians to work off the clock is probative of Qwest's position that it did not know, nor should it have known, that such work was occurring. The named Plaintiffs and the other technicians who have opted in are required to show that they worked off the clock in order to meet QJD expectations. To that end, Plaintiffs have adduced evidence to support such a showing, including questionnaire responses from 90% of 164 Plaintiffs indicating the reason that best explains why they purposely understated the number of hours worked and worked through their lunch breaks was to make their QJD numbers look better.[6] Morgan Aff., Ex. 81. The viability of Plaintiffs' claims does not depend on also showing that QJD forced the other 800-plus technicians who have not opted into this litigation to work off the clock.

---

[6] Qwest repeatedly contends that Plaintiffs must support their claims through "specific, substantial evidence," and that questionnaire responses and deposition statements amount to "individualized anecdotes" that do not qualify as "specific, substantial evidence." Defs.' Rep. Mem. in Supp. of Rule 56(d) Mot. at 3, 5. While withstanding summary judgment requires a demonstration that "specific facts" exist in the record, and reliance on mere allegations in a pleading is not sufficient, no authority supports Qwest's apparent suggestion that summary judgment also requires that the evidence on which Plaintiffs rely be "substantial," "substantiated," or consisting of more than their own testimonial statements. Whether Plaintiffs' evidence is sufficient despite its claimed lack of substantiation and corroboration is an issue regarding the weight and credibility of the evidence.

Fundamentally, Qwest's emphasis on "uniformity" is a rehash of arguments that were made, or should have been made, in the motion to decertify. For example, Qwest argues that "the variability in Plaintiffs' QJD expectations across buckets, across director organizations, and across time precludes proof that QJD forced unpaid overtime on a class-wide basis." Defs.' Mem. in Supp. of Rule 56(d) Mot. at 24. Qwest also contends that different technicians differ in their speed and skill. These arguments are equivalent to contentions Qwest raised in its decertification motion, that disparate factual and employment settings and individualized defenses preclude a determination that Plaintiffs are similarly situated. See June 4, 2009 Order at 5-12. The Court declines the invitation to revisit the reasons underlying its decertification decision issued more than a year ago.

### 2. Knowledge of Off-the-clock Work

Qwest next argues that Plaintiffs have failed to present "substantial evidence" that Qwest knew or should have known that technicians were working off the clock in order to comply with QJD expectations. Qwest contends that in a collective action, proving actual or constructive knowledge by Qwest of off-the-clock work "requires more than individualized anecdotes suggesting reports of alleged unpaid work by some employees." Defs.' Mem. in Supp. of Rule 56(d) Mot. at 26. Instead, Qwest suggests, Plaintiffs should be required to identify evidence of (1) "statements by corporate executives that might suggest corporate ambitions for, encouragement of, or . . . knowing acquiescence to off-the-clock work"; (2) "an illicit attempt to improve Qwest's bottom line by forcing employees to work overtime without reporting it"; or (3) a "systemic practice to discipline technicians for reporting overtime." Id. at 26-27.

In denying Qwest's decertification motion, this Court determined that "Plaintiffs have . . . proffered evidence that, if believed, shows Qwest knew or should have known that technicians were working off-the-clock in order to meet QJD standards." June 4, 2009 Order at 10-11. The evidence cited in the June 4, 2009 Order and additional evidence that, if credited by the factfinder, supports an inference of actual or constructive knowledge of a not uncommon practice of performing off-the-clock work to meet QJD expectations, includes: Morgan Aff., Ex. 14 (Diercks Depo.) at 33-34, 108; Ex. 17 (Engelhardt Depo.) at 19; Ex. 23 (Furo Depo.) at 30-32; and Ex. 56 (Puppe Depo.) at 76.[7] The previously mentioned evidence that technicians were commonly assigned a daily work load that Qwest itself estimated would require as much as ten or eleven hours to complete is further evidence that could support an inference of Qwest's actual or constructive knowledge.[8]

Qwest next argues that courts have "widely rejected" theories asserting that an employer may be held liable for unpaid overtime when the employees themselves under-reported their time. See Defs.' Mem. in Supp. of Rule 56(d) Mot. at 28-29. The Court previously decided this issue when it concluded, in ruling on Qwest's decertification motion, that unlike cases in which

---

[7] Qwest relies on Seever v. Carrols Corp., 528 F. Supp. 2d 159, 169-70 (W.D.N.Y. 2007), as standing for the proposition that off-the-clock claims "supported solely by the testimony of plaintiffs themselves . . . [and] which . . . are uncorroborated by any other evidence" fail as a matter of law. To the extent that Seever so held, the Court declines to follow such a ruling, which would impose a heightened standard requiring a certain quality and quantum of evidence to survive summary judgment.

[8] Qwest contends that because this is a collective action, Plaintiffs should not be permitted to attempt to prove actual or constructive knowledge through evidence of what information individual technicians and supervisors were privy to because doing so would defeat the purpose of a collective action, which is to test the claims through evidence common to the entire class. However, evidence of what individual technicians and supervisors knew is clearly relevant to whether Qwest had constructive notice of off-the-clock work among its technicians.

the employee was estopped from asserting a claim for unpaid overtime when the employee self-reported his hours worked and the record lacked any evidence to show that the employer knew or should have known that the employee was under-reporting his time, the record here includes evidence that could support an inference that Qwest knew or should have known of the claimed motivation for technicians to under-report their work hours. June 4, 2009 Order at 10-11 (distinguishing Brumbelow v. Quality Mills, Inc., 462 F.2d 1324, 1327 (5th Cir. 1972)). The cases cited by Qwest in its brief, none of which are binding on this Court, do not alter the Court's previous conclusion.

Davis v. Food Lion, 792 F.2d 1274 (4th Cir. 1986), does not support the argument that, as a matter of law, Plaintiffs' litigation theory regarding QJD is untenable on the issue of actual or constructive knowledge. Davis involved a factual finding in a district court bench trial that an employer had no actual or constructive knowledge of off-the-clock work when the district court credited, inter alia, the employer's evidence that it fully enforced its policy against off-the-clock work. 792 F.2d at 1277-78. The Fourth Circuit affirmed, concluding no clear error occurred when "[t]he district court weighed the evidence presented by the litigants, evidence that cuts both ways, and found that [the defendant] had no actual or constructive knowledge of [plaintiff's] off-the-clock work." Id. at 1278. Davis is actually supportive of the position that here, too, there are weight and credibility issues regarding the evidence that preclude summary judgment. Similarly, Robertson v. Board of County Commissioners of County of Morgan, also shows that although an employee can be precluded from claiming unpaid overtime when he fails to notify or deliberately prevents the employer from acquiring knowledge of alleged overtime

work, summary judgment is not appropriate when there are unresolved fact issues regarding the employer's actual or constructive knowledge. 78 F. Supp. 2d 1142, 1158 (D. Colo. 1999).

Prince v. MND Hospitality, Inc., another case cited by Qwest, was a denial of summary judgment where the evidence was similar in nature to evidence in this case. No. H-08-2617, 2009 WL 2170042 (W.D. Tex. July 20, 2009). There, the court acknowledged that an employee cannot claim unpaid overtime when the employee fails to notify the employer or deliberately prevents the employer from learning about the overtime work. Id. at *7. The court concluded, however, that evidence of record permitted "an inference that [the defendant] had actual or constructive knowledge that [the plaintiff] worked overtime hours for which he was not compensated." Id. at *11. Specifically, the court held that the following evidence raised fact issues regarding whether the employer had actual or constructive knowledge of the off-the-clock work: (1) the plaintiff's testimony that he routinely prepared his vehicle and stocked it with supplies before his shift began and that supervisors regularly saw him do this work; (2) evidence that various supervisors were routinely in the maintenance area and saw the plaintiff doing his work; (3) the plaintiff's testimony that he had regular discussions with his regular supervisor about the work he had to do before his shift began; and (4) the plaintiff's testimony that he complained to several supervisors about not being able to take his meal breaks. Id. at *11-12.

Unlike many of the cases cited by Qwest, where no evidence in the record contradicted the supervisors' testimony that they had no knowledge of off-the-clock work and the employees' admissions that they never mentioned unpaid overtime to any supervisor—see, e.g., Forrester, 646 F.2d at 414-15—there is evidence in this case that raises genuine issues as to whether Qwest had actual or constructive knowledge of off-the-clock work. See Holzapfel v. Town of

13

Newburgh, 145 F.3d 516, 521-22 (2d Cir. 1998) (holding that a jury was needed to decide the fact question of how much of the time claimed by the employee to have been spent working was "spent with the employer's actual or constructive knowledge"); Humana, Inc. v. Shook, 798 F.2d 469, 1986 WL 17218, at *1-3 (6th Cir. 1986) (per curiam) (holding that employee testimony that a supervisor was aware an employee started work before her shift and continued working after it ended created genuine issues of material fact for the jury as to the alleged unpaid overtime work, the reasons underlying the alleged under-reporting on time records, and the employer's knowledge of the unpaid overtime, even though contradictory evidence by supervisors and other employees existed, the employee admitted that no supervisor had ever asked her to perform the off-the-clock work, and it was the employer's policy to mark down all extra time); cf. Worldwide Labor Support of Miss., Inc. v. United States, 312 F.3d 712, (5th Cir. 2002) (holding, in the context of a dispute over whether an employer was entitled to a refund of employment taxes assessed against employees' hourly per diem travel expense reimbursements, that whether an employer "knew or should have known that some or even many of its . . . employees would work overtime is *quintessentially* a fact issue as to reasonableness and state of mind for the jury to decide based on its assessment of the witness testimony and evidence presented to it") (emphasis added).[9]

Lastly, Qwest argues that no evidence has been identified to show Qwest's knowledge that its "out-of-the-garage rule" caused off-the-clock work. To the contrary, Plaintiffs have

---

[9] Qwest emphasizes that the union representing the technicians never filed any grievances alleging that unpaid overtime work was occurring. While that evidence may be relevant to persuading the factfinder to adopt its position that Qwest had no actual or constructive knowledge of off-the-clock work, it does not somehow erase the evidence Plaintiffs have produced in support of their position.

evidence of record that (1) the nature and extent of the tasks to be completed before leaving for the first job of the day required technicians to begin work prior to the start of their shift in order to have enough time to complete those tasks and leave within fifteen minutes of the start of their shift, as required by the out-of-the-garage rule, (2) the alleged off-the-clock work was performed to comply with both the out-of-the-garage rule and QJD expectations; and (3) would support a reasonable inference that Qwest had actual or constructive knowledge of such off-the-clock work. See Morgan Aff., Ex. 18 (Erickson Depo.) at 45; Ex. 27 (Hightshoe Depo.) at 49; Ex. 50 (Olson Depo.) at 49-50; Ex. 55 (Plaster Depo.) at 46; Ex. 58 (Richard Depo.) at 207. For example, one technician explained:

> A. . . . You have to start early because they wanted you out of the garage by ten minutes after 8, and if you came in, started at 8:00, you would never get out of there before 8:30, because it took that long. You had to . . . boot up your computer and . . . get online and then get your jobs and write them down, and . . . then you had to go out and supply your truck. So you just came in ten, 15 minutes early and started. And, you know, and when you're working, say you're working at somebody's house at lunchtime, you know, and you only got . . . like 15 minutes left to finish your job there . . . . Would [a customer] appreciate me saying, well, it's lunchtime, I have to go . . . sit in my truck and twiddle my thumbs for 30 minutes and then come back and finish [the job]? . . . So to keep good customer relations, you finished the job and went on to the next. And [Qwest] insisted that you put down a lunch every day because there was some state law or something saying that you could not go without a lunch. So you had to work with a lunch, even though you didn't . . . take a lunch.
>
> And then . . ., at night, when you come in, it's the same thing . . . . You work and you finish the job and then try [to] make it back to the garage, and instead of getting off at 4:30, you're getting off at ten to 5 . . . . And in order to get overtime approved, you had to find somebody that would approve it . . . .

Ex. 47 (Mikush Depo.) at 16-17.

Plaintiffs' evidence demonstrates the existence of genuine issues of material fact regarding (1) whether Plaintiffs performed off-the-clock work to comply with QJD expectations and the out-of-the-garage rule and (2) whether Qwest had actual or constructive knowledge that QJD and the other requirements and expectations were causing this off-the-clock work. Qwest's extensive recitation of its contrary evidence that QJD expectations are objectively reasonable and that Qwest cannot be charged with actual or constructive knowledge of technicians' off-the-clock work demonstrates a strong case for the factfinder, but it is not a basis for disregarding Plaintiffs' contrary evidence and granting summary judgment in its favor.

**C.      Qwest's Motion for Summary Judgment**[10]

By its second motion, Qwest seeks a ruling that Plaintiffs have failed to identify evidence to establish that they actually performed off-the-clock work and that Qwest management knew or should have known about it.

**1.      Performance of Off-the-clock Work**

To establish an FLSA claim for unpaid overtime, the employee must (1) prove "that he has in fact performed work for which he was improperly compensated" and (2) "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946), cited in Hertz, 566 F.3d at 783.

---

[10] Plaintiffs do not dispute dismissal of (1) Qwest Communications International, Inc. and Qwest Communications Corporation as not being proper party defendants to Plaintiffs' FLSA claims; and (2) the state law claims. See Pls.' Resp. to Mot. For Summ. J. [Docket No. 442] at 2 n.1. Accordingly, dismissal of Qwest Communications International, Inc. and Qwest Communications Corporation and the state law claims is granted.

Qwest first argues Plaintiffs' claim that unpaid overtime work actually occurred is precluded by evidence that (1) Qwest's policies unequivocally prohibit off-the-clock work and require technicians to report their compensable time accurately; (2) Qwest trusts network technicians to report their compensable time honestly; (3) Qwest specifically makes paid time available for the tasks Plaintiffs claim they are required to complete at the beginning and end of their shifts; and (4) Qwest pays for every minute of overtime that is reported. Defs.' Mem. in Supp. of Mot. for Summ. J. [Docket No. 400] at 5-9. Qwest's evidence may detract from the weight and credibility of Plaintiffs' evidence that they actually did work off-the-clock, but it does not establish that, as a matter of law, Plaintiffs are precluded from presenting their claims.

Qwest next argues that "Plaintiffs should be strictly held to their burden to establish the fact and extent of alleged unpaid overtime" by "specific, substantial evidence demonstrating that they actually worked additional time they did not report" and should not be allowed to base their claims on their own, uncorroborated testimony. Id. at 9-10. An employer's compliance, or lack thereof, with the requirements in 29 U.S.C. § 211(c) of "mak[ing], keep[ing], and preserv[ing] . . . records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him" determines the burden of proof a plaintiff must carry in establishing the number of overtime hours worked. See McGrath v. Central Masonry Corp., No. 06-cv-00224, 2009 WL 3158131, at *6 (D. Colo. Sept. 29, 2009). "If an employer complies with the requirements, the plaintiff must prove with definite and certain evidence that he worked overtime hours for which he did not receive compensation." Id. (quotation omitted). But if an employer does not comply with the requirements or the employer's records cannot be trusted, the plaintiff is required only to show "'that he has in fact performed work for which he

was improperly compensated'" and to produce "'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" Allen, 495 F.3d at 1316 (quoting Anderson, 328 U.S. at 687).

Relying heavily on Seever, supra n.7, Qwest argues inaccuracies in the time records were due to Plaintiffs' failure to ensure that the records accurately reported the total amount of time worked and, therefore, Plaintiffs are required to present specific evidence showing when and for how long they worked off the clock. Critical to the analysis in Seever was that there was no genuine dispute that the inaccuracies in the time records were "*solely due to plaintiffs' deliberate failure to accurately record the time they worked.*" 528 F. Supp. 2d at 170. Here, however, as discussed in the previous section, see supra III.B, there is a genuine dispute as to whether the inaccuracies in the time records were not solely due to Plaintiffs' deliberate failure to accurately record time but also to QJD expectations and the out-of-the-garage rule.

"The burden to maintain accurate records falls on the employer regardless of whether the employee is responsible for recording his own hours on a time sheet." McGrath, 2009 WL 3158131, at *6; see also Skelton v. Am. Intercontinental Univ. Online, 382 F. Supp. 2d 1068, 1071-72 (N.D. Ill. 2005) ("The FLSA makes clear that employers, not employees, bear the ultimate responsibility for ensuring that employee time sheets are an accurate record of all hours worked by employees."). Accordingly, if an employer commands, entices, or encourages its employees not to record all of their overtime, it cannot then "hide behind a policy of having employees keep their own time." Id. at 1072. Likewise, if an employer has actual or constructive knowledge that its employees are not recording all of their overtime, whatever the reason for the under-reporting might be, the employer "cannot sit back" or "stand idly by" and

allow the employee to under-report his time.  Bull v. United States, 68 Fed. Cl. 212, 224-25 (Fed. Cl. 2005), aff'd, 479 F.3d 1365 (Fed. Cir. 2007); Russel v. Ill. Bell Tel. Co., Inc., ___ F. Supp. 2d ___, 2010 WL 2595234, at *9 (N.D. Ill. 2010) (holding that "lawful written (or [oral]) policies will not shield [an employer] from liability if [the employees] can show other company-wide practices that may have been contrary to those policies and violated the FLSA").

As discussed previously, see supra nn.7-8, no greater quantum or quality of evidence is required to survive summary judgment in an off-the-clock case.  As one court aptly observed, accepting such an argument

> would ignore the general principles arising under the FLSA case law on this issue, as well as certain well-established principles relating to the entry of summary judgment.  In the broadest sense, [the plaintiff's] burden on his off-the-clock claim is merely to establish that he performed compensable work for a number of hours for which he was not properly compensated by his employer, who either did know or had reason to know that he was working off-the-clock.

England v. Advance Stores Co. Inc., 263 F.R.D. 423, 450 (W.D. Ky. 2009) (citing Hertz, 566 F.3d at 783).  "While a baldly conclusory and self-serving affidavit devoid of any substantial detail may not be relied on, a plaintiff who alleges that he or she was not paid, but was forced to work off-the-clock, will avoid [judgment] as a matter of law so long as the evidence put forward by the employee," which can consist solely of the plaintiff's own testimony, "is a sufficient basis on which a reasonable juror could infer that the employee had performed work for his or her employer for which no compensation had been paid and the employer had reason to know of such circumstances."  Id. (citation omitted).  Having recognized these principles, the court in England concluded:

> Here, as a matter of well-established law, we must accept [the plaintiff's] testimony as being true.  [The plaintiff] testified that the store manager trained him that he must clock out all of the store employees . . . prior to entering the amount of cash on hand in the

safe. [The plaintiff] testified that he repeatedly grumbled to the store manager about this requirement that forced him and the others to work off-the-clock when closing the store. The fact that [the plaintiff] did not complain higher up the chain, or that he did not go behind and manually correct the time records . . . are circumstances that do not work as a matter of law to deny [his] right to recovery, but more naturally run to the question of mitigation and the extent of any possible recovery rather than the right to pursue it in the first instance. Looking to all of the evidence, along with the FLSA case law cited herein, and the standard for summary judgment, the Court concludes that genuine issues of material fact preclude entry of summary judgment on . . . [the plaintiff's] claim to recover for the off-the-clock work that he regularly performed as part of the store closing process.

Id. at 450-51 (citations omitted) (footnote omitted).

The record in this case compels the same conclusion. Plaintiffs have evidence, their responses to interrogatories and a specially prepared questionnaire and their deposition testimony, that they performed off-the-clock work and setting forth good-faith estimates[11] of the number of hours for which they were not paid. See, e.g., Morgan Aff., Ex. 97 at 6-7; Ex. 81 at Q.17; Ex. 44 (Lundell Depo.) at 119-25; Olson Depo. at 60-65; Puppe Depo. at 10-11. Plaintiffs have presented statements by Qwest supervisors that support an inference that Qwest supervisors were aware that technicians were having difficulties complying with the out-of-the-garage rule, which also would negatively impact QJD scores. See Morgan Aff., Ex. 2 (Bender Depo.) at 73-78; Ex. 31 (Kanzenbach Depo.) at 12-14; Ex. 62 (Scribner Depo.) at 38; Ex. 101 (Lecy Decl.) ¶¶ 4-7. In addition, Plaintiffs have identified documentary evidence, including an email from a Qwest operations manager, that can be construed to support the allegation that technicians were

---

[11] Qwest alleges that "the numbers submitted were not fact-based estimates from the individual Plaintiffs, but rather were amounts manufactured by Plaintiffs' counsel." Defs.' Mem. in Supp. of Summ. J. at 12-13. An accusation of manufacturing evidence should not be leveled lightly.

working off the clock to comply with QJD expectations and the out-of-the-garage rule and that Qwest was aware of such off-the-clock work.  See id., Ex. 93; see also Ex. 86 at 3.

Lastly, Plaintiffs cite evidence that Qwest supervisors receive daily information in connection with the Work Force Administration ("WFA") system, which is used to allocate and balance job assignments among technicians, see Peirce 2d Suppl. Aff. ¶¶ 24-27, showing that it was a fairly common occurrence for the number of dispatch hours reported by technicians to exceed the total number of payroll hours reported.  Id. ¶ 29.  Qwest's expert testified that "in general" WFA dispatch hours would exceed payroll hours.  See Morgan Aff., Ex. 3 (Berringer Depo.) at 148.  Plaintiffs reason that a larger number of dispatch hours compared to payroll hours indicates that technicians were performing compensable work that was not being reported on their payroll records.  Qwest responds that the disparity between dispatch hours and payroll hours "is not accurate evidence of a technician's total work time on any given day."  Defs.' Mem. in Supp. of Summ. J. at 23 n.7.  Qwest's manager of process management explains that comparing the total number of dispatch hours to payroll hours is not "reliable evidence of underpayment" because a technician could (1) dispatch on a job but not start actually working and instead have coffee with co-workers, (2) inadvertently or purposefully stay dispatched on a job during his meal break, the performance of union activities, or even after he has finished the job, or (3) double count his dispatch time by reporting overlapping jobs.  Peirce 2d Suppl. Aff. ¶ 24.  These are plausible explanations, but so too is the explanation by Plaintiffs that they were indeed performing compensable work during the reported dispatch hours yet reporting fewer payroll hours.  Deciding which explanation to believe is a matter for the factfinder.

### 2. Knowledge of Off-the-clock Work

The Court has already concluded in the analysis of Qwest's Rule 56(d) Motion, see supra III.B.2, that Plaintiffs have demonstrated the existence of facts creating a triable issue regarding Qwest's actual or constructive knowledge that Plaintiffs performed off-the-clock work to comply with QJD expectations and the out-of-the-garage rule. No further discussion of the issue is necessary here.

### D. Request for Sanctions

Plaintiffs argue that Qwest's challenge to the viability of predicating FLSA liability on QJD expectations and the out-of-the-garage rule amounts to "unreasonable, vexatious re-briefing" of issues that were decided in the Court's June 4, 2009 Order denying decertification and, for that reason, is sanctionable under 28 U.S.C. § 1927. The legal and factual issues in this litigation are complex and raise novel issues of FLSA law and the practical manageability of collective actions. The factual record has been developed significantly since the June 4, 2009 Order, and a decertification analysis is quite different from a summary judgment analysis. Qwest's summary judgment motions, though improperly postured as two motions rather than one and perhaps revisiting issues previously discussed in a different context, do not evince an intentional or reckless disregard of duties to the Court. See Manion v. Nagin, No. Civ. 00-238, Civ. 02-370, 2004 WL 234402, at *10 (D. Minn. Feb. 5, 2004) (citing Lee v. First Lenders Ins. Servs., Inc., 236 F.3d 443, 445 (8th Cir. 2001))

# IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.      Qwest's Rule 56(d) Motion [Docket No. 395] is **DENIED**; and

2.      Qwest's Motion for Summary Judgment [Docket No. 398] is **GRANTED IN PART** and **DENIED IN PART**;

3.      Defendants Qwest Communications International, Inc. and Qwest Communications Corporation are **DISMISSED**; and

4.      Counts II, III, IV, and V of the Complaint [Docket No. 1] are **DISMISSED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  July 20, 2010.